Harry TOSCANO, an individual,
Plaintiff–Appellant,

v.

PROFESSIONAL GOLFERS' ASSOCIATION, a Maryland Nonprofit Corporation, dba Senior PGA Tour; Jim Colbert, an individual; Bruce Devlin, an individual; Terry Dill, an individual; Dale Douglass, an individual; Raymond Floyd, an individual; Gibby Gilbert, an individual; Bob Goalby, an individual; Mike Hill, an individual; Ken Still, an individual; Bell Atlantic Corporation, a Delaware Corporation; Boone Valley, a Business Entity; Brickyard Crossing, a Business Entity; Bruno's Inc., an Alabam Corporation; Burnet, a Business Entity; Chrysler Corporation, a Delaware Corporation; Diners Club International, a Business Entity; Eveready Battery Company, a Corporation; First of America, a Business Entity; Ford Motor Company, a Delaware Corporation; The Gillette Company, a Delaware Corportation; The Kroger Company; an Ohio Corporation; Liberty Mutual Group, a Business Entity; Mercedes–Benz of North America, Inc., a Corportation; NYT Magazine Group, a Business Entity; Quicksilver, a Business Entity; R.J. Reynolds Tobacco, Corporation, a Business Entity; Toyota Motor Corporation, a Corporation; Wendy's International, Inc., an Ohio Corporation; Nationwide Insurance, Enterprises, a Business Entity; Toshiba Corporation, a Corporation; PGA Tours, Inc.; Dave Stockton, an Individual; Dean R. Beman; Timothy W. Finchem; Ojai Golf Charitites, a California Nonprofit Corporation, Defendants,

and

American Express Company, a New York Corporation; Ameritech Corporation, a Delaware Corporation; Bankboston Corporation, a Corporation; Banc One Corporation, an Ohio Corporation; Bellsouth Corporation, a Georgia Corporation; Country–Wide Credit Industries, Inc., a Delaware Corporation; FHP Health Care, a Business Entity; Franklin Quest Company, a Utah Corporation; General Motors Corporation, a Delaware Corporation; GTE Corporation, a New York Corporation; Hyatt Corporation, a Corporation; LG Group, a

Business Entity; Paine Webber Group, Inc., a Delaware Corporation; Raley's, a Business Corporation; Ralph's Grocery Company, a Corporation; Royal Carribean Cruise Line, a Business Entity; SBC Communications, Inc., a Delaware Corporation; The Scotts Company, an Ohio Corporation; Transamerican Corporation, a Delaware Corporation; Truegreen–Chemlawn, a Business Entity; Gold Rush Classics, a California Nonprofit Corporation; Centinela Hospital Medical Center; Classic Charities Of Orange County, a California Nonprofit Corporation; Grand Slam Charities, an Ohio Nonprofit Corporation, Defendants–Appellees.

No. 00–15101.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 11, 2001

Filed Aug. 2, 2001

Paul Smith, Dallas, Texas, for plaintiff-appellant Toscano.

Andrew D. Hurwitz, Phoenix, Arizona, for defendants-appellees Local Sponsors.

J. Thomas Rosch, San Francisco, California, for Title Sponser General Motors.

Before: SCHROEDER, CHIEF JUDGE, LAY,* and DAVID R. THOMPSON, Circuit Judges.

DAVID R. THOMPSON, Circuit Judge:

Plaintiff Harry Toscano, a professional golfer, appeals the district court's summary judgment in favor of the sponsors of Senior PGA Tour golf tournaments, on his claim under section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1 (1994). Toscano alleges that the defendants entered into a contract, combination, or conspiracy to unreasonably restrain trade in professional golf and among professional golfers by agreeing to sponsor golf tournaments in accordance with PGA Tour rules and regulations.[1]

The sponsor defendants sought summary judgment solely on the basis that there was no actionable section 1 agreement among any of the defendants. The district court agreed. It ruled that there

---

* Honorable Donald Lay, Circuit Judge, Eighth Circuit Court of Appeals, sitting by designation.

1. The plaintiff's claim against the PGA Tour is still pending in district court.

was no direct evidence of such an agreement, and Toscano's circumstantial evidence failed to meet the summary judgment requirements of *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). We have jurisdiction under 28 U.S.C. § 1291 (1994) and we affirm.

## I

The Senior PGA Tour was organized to showcase senior golfers who had previously been successful on the regular PGA Tour. It adopted player eligibility criteria emphasizing both current performance and prior success. Current eligibility regulations provide that the 78–player field in Senior PGA Tour events will be made up of (a) the top 31 available players from the previous year's Senior PGA Tour Money List, (b) the top 31 available players from the All–Time Career Money List (including money won in PGA Tour and Senior PGA Tour events) who were not in the first list, (c) the top eight players from the yearly Senior PGA Tour National Qualifying Tournament, (d) any other players who won a Senior PGA Tour tournament within the past 12 months, (e) the four low scorers in a qualifying round held on the Monday before play begins in a particular tournament, (f) players (usually four) designated by the local host organization as "sponsor exemptions," and (g) any otherwise non-exempt player who has won an official PGA Tour or Senior PGA Tour tournament.

Toscano is a 58–year old golfer who began participating in Senior PGA Tour events upon turning 50 in 1992. In late 1992, Toscano was one of the top eight finishers in the Senior PGA Tour Qualifying Tournament and, therefore, qualified for all Senior PGA Tour open events in

1993. He participated in 32 of the 36 senior tour open events that year and earned a total of $204,391.00, but he was not among the top 31 money winners as required to maintain his exempt status for the following year.

Toscano failed to qualify (or did not participate for health reasons) in the Senior Tour Qualifying Tournament in each year from 1993 through 1999. Nevertheless, through one form of qualification or another, Toscano was able to compete in 29 of the 36 Senior PGA Tour open events in 1994, 33 of the 38 Senior PGA Tour open events in 1995, 24 of the 38 Senior PGA Tour open events in 1996, and a lesser number of tournaments in later years. In none of those years did Toscano win a tournament or finish sufficiently high on the money list to obtain exempt status for the following year.

A Senior PGA Tour tournament has both a "local sponsor" and a "title sponsor." A local sponsor organizes a tournament and receives a share of the tournament's profits, usually for charitable purposes. Typically, a local sponsor contracts with the PGA Tour to provide facilities, prizes, and other services: the local sponsor obtains the site, arranges volunteer or other assistance for the event, publicizes and promotes the event, arranges for sales of concessions and certain player slots, and provides the bulk of the tournament prize money. The local sponsor's contract defines player eligibility by PGA Tour rules and regulations, prohibits local sponsors from offering appearance incentives, and assigns the sponsor's broadcasting rights to the PGA Tour. The contract also guarantees a local sponsor that its tournament will be the only Senior PGA Tour event on the weekend of that tournament.[2]

2. Contracts between the PGA Tour and local sponsors include the following terms, or substantially similar terms:

PGA TOUR will provide services for such competition in accordance with the provisions herein and with the SENIOR PGA

The local sponsors' contracts also provide that they "agree to organize and conduct the tournament in accordance with PGA Rules and Regulations." These rules and regulations, incorporated by reference into the contracts, prohibit players from participating in non-PGA Tour events that conflict with a Senior PGA Tour event without prior PGA Tour approval (the "conflicting event" rule); prohibit players from participating in any televised golf program, regardless of the date, without prior PGA Tour approval (the "television release" rule); and define player eligibility. Toscano states that these restrictions effectively deprive any potential competing tournaments of access to the "marquee" players and give "those players already on the Tour ... a huge advantage over non-Tour players when it comes to being able to get on and stay on the Senior Tour."

Senior PGA Tour tournaments also have "title sponsors," typically large corporations that contract with local sponsors to provide financial support for tournaments in exchange for the right to have a tournament named after them, as well as for additional promotional benefits. With one exception, the title sponsors in this suit did not contract directly with the PGA Tour.

## II.

We review de novo a grant of summary judgment. *Weiner v. San Diego County*, 210 F.3d 1025, 1028 (9th Cir. 2000). Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56. Summary judgment is disfavored in complex antitrust litigation where motive and intent are important, proof is largely in the hands of the alleged conspirators, and relevant information is controlled by hostile witnesses. *Movie 1 & 2*

TOUR Tournament Regulations as they may from time to time apply, and which are incorporated herein by reference. Changes to the SENIOR PGA TOUR Tournament Regulations made subsequent to this Agreement which substantially affect Sponsor's rights herein will be subject to negotiation and mutual agreement by PGA TOUR and Sponsor.

. . . . .

PGA TOUR will cosponsor and approve the Tournament, the Qualifying Round, if any, and the Pro–Am.
PGA TOUR will not schedule, co-sponsor or approve any other SENIOR PGA TOUR golf event on a date of the Tournament, the Qualifying Round or the Pro–Am. . . .

. . . . .

PGA TOUR will fill the field of contestants in accordance with the SENIOR PGA TOUR Tournament Regulations.

. . . . .

Players eligible to apply to enter the Tournament shall be those prescribed in the SENIOR PGA TOUR Tournament Regulations.

. . . . .

All media rights, including but not limited to the rights for television, radio and computer network/internet broadcasting, and for production and exhibition, in any form, of motion pictures and all other ancillary rights in the events and practice covered by this Agreement, including any such rights of each player which have been assigned by the players to PGA TOUR, are the property of and expressly reserved by and to PGA TOUR.

. . . . .

Neither players nor another individual acting on a player's behalf shall solicit or accept any compensation, gratuity or other thing of value for the purpose of guaranteeing a player's appearance in the Tournament, including the Pro–Am event. . . . Sponsor shall make no such offer and shall immediately report to PGA TOUR any solicitation for such a fee by a player or an individual who purports to be acting on behalf of a player.

*v. United Artists Communications, Inc.,* 909 F.2d 1245, 1248 (9th Cir.1990) (quoting *Poller v. Columbia Broad. Sys., Inc.,* 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962)). "Summary judgment is appropriate only in the clear absence of any significant probative evidence tending to support the complaint." *Id.* at 1249 (citing *Theee Movies of Tarzana v. Pacific Theatres, Inc.,* 828 F.2d 1395, 1398 (9th Cir.1987)).

### III.

■ Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, states, "Every contract, combination ..., or conspiracy, in restraint of trade or commerce ... is declared to be illegal." Under this section, "concerted action of more than a single entity" is required. *The Jeanery, Inc. v. James Jeans, Inc.,* 849 F.2d 1148, 1152 (9th Cir.1988). For an agreement to constitute a violation of section 1 of the Sherman Act, a "conscious commitment to a common scheme designed to achieve an unlawful objective" must be established. *Monsanto Co. v. Spray–Rite Serv. Corp.,* 465 U.S. 752, 764, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984) (citations omitted).

■ An agreement can be shown to be in restraint of trade by either direct or circumstantial evidence. Direct evidence is that which can defeat a request for summary judgment if "taken as true," whereas circumstantial evidence can defeat a summary judgment motion only if inferences are drawn in the nonmovant's favor. *In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litigation,* 906 F.2d 432, 441 (9th Cir.1990) (*In re Coordinated Pretrial Proceedings* ) (quoting *McLaughlin v. Liu,* 849 F.2d 1205, 1208 (9th Cir.1988)); *see also In re Citric*

*Acid Litigation,* 191 F.3d 1090, 1093–94 (9th Cir.1999).

### A. Local Sponsors

■ Toscano contends that the contracts between the local sponsors[3] and the PGA Tour provide direct evidence of a section 1 agreement in restraint of trade sufficient to withstand summary judgment. He relies on the parts of the local sponsors' contracts by which they agree to run tournaments in accord with PGA Tour rules and regulations. He contends these rules and regulations restrict competition among professional golfers and golf tournaments.

The local sponsors maintain that the district court correctly determined there was no direct or circumstantial evidence of an agreement in restraint of trade because the defendants merely accepted the PGA Tour's rules and regulations and played no role in creating or enforcing them. We agree with the district court.

■ "A manufacturer of course generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently.... And a distributor is free to acquiesce in the manufacturer's demand in order to avoid termination." *Monsanto,* 465 U.S. at 761, 104 S.Ct. 1464 (citations omitted). Consistent with this stricture, the Tenth Circuit has held that contracts between an airline and members of its travel awards program that prohibit the members from reselling their awards do not constitute concerted action where "[n]o evidence in the record suggest[ed] that [the airline] did not independently set the terms under which it would offer its travel awards, and the mere fact that its members accepted those terms does not

3. Defendant Royal Caribbean Cruises, Ltd. is included as a local sponsor because it acted as both a local and title sponsor. The other local sponsors are Gold Rush Classic, Inc., Grand Slam Charities, Inc., Centinela Hospital Medical Center, and Classic Charities of Orange County.

generate the kind of concerted action needed to violate Section 1." *American Airlines v. Christensen*, 967 F.2d 410, 413–14 (10th Cir.1992). Similarly, where real estate developers and mortgage lenders acquiesced to an investor's "restrictive commitment letters" prohibiting them from hiring nonunion labor, and where there was "no evidence that these individuals influenced or were at all involved in the establishment of the union-only investment policy," there was no section 1 Sherman Act conspiracy, and summary judgment was appropriate. *Beutler Sheetmetal Works v. McMorgan & Co.*, 616 F.Supp. 453, 456 (N.D.Cal.1985). In both cases, the defendants merely agreed to purchase products or provide a service under conditions set by the other party. The defendants did not make a "conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto*, 465 U.S. at 764, 104 S.Ct. 1464.

Likewise, in the present case, the local sponsors' contracts demonstrated only that they agreed to purchase a product, *i.e.*, a Senior PGA Tour event that was presented to them by the PGA Tour. They did not commit to a common scheme to act in restraint of trade. They acted independently of the PGA Tour and of one another. Their promises to refrain from offering appearance incentives to players, to report any individual who solicited such a fee, to cede all broadcast rights to the PGA Tour, to permit the PGA Tour to "fill the field of contestants in accordance with the SENIOR PGA TOUR Tournament Regulations," and that "[p]layers eligible to apply to enter the Tournament shall be those prescribed in the SENIOR PGA TOUR Tournament Regulations" show only that the local sponsors accepted the fact that the tournaments would be operated according to the PGA Tour's rules and regulations, not that they agreed to use those rules to restrain trade. The PGA Tour's promise that the local sponsors' individual tournaments would not conflict with any other Senior PGA Tour event is a scheduling commitment made as part of the tournament package offered to the local sponsors. The local sponsors' acceptance of that part of the package provides no evidence of concerted action to restrain trade.

In sum, just like the defendants in *Christensen* and *Beutler*, the local sponsors had no involvement in the establishment or enforcement of the allegedly anticompetitive provisions of the contracts. Although Toscano correctly points out that *Christensen* involved individual consumers rather than corporate entities as buyers, the principle of that case still applies: the PGA Tour independently set the terms of the contracts, and the local sponsors merely accepted them.[4]

Toscano's attempt to liken this case to *Volvo N. Amer. v. Men's Int'l Prof'l Tennis Council*, 857 F.2d 55 (2d Cir.1988), fails. The Second Circuit in *Volvo* did not address the question whether a tournament sponsor who did not help create anticompetitive rules could be liable under section 1 of the Sherman Act.

Toscano also argues that the district court erred by applying the summary judgment standard of *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), because, he contends, he offered direct rather than circumstantial evidence of concerted action in violation of section 1. He correctly asserts that the *Matsushita*

---

4. Toscano's contention that the method of doing business in *Beutler* did not involve an actual contract is incorrect. The developers and lenders in *Beutler* received "restrictive commitment letters" documenting their agreement to perform work for the investors, and those letters served as contractual agreements. *Beutler*, 616 F.Supp. at 456.

analysis applies only when an inference of conspiracy must be made from circumstantial evidence. *See In re Coordinated Pretrial Proceedings*, 906 F.2d at 441; *see also Citric Acid*, 191 F.3d at 1094.

Toscano's argument proceeds from the false premise that he presented direct evidence of concerted action in violation of section 1. He did not. The terms of the local sponsors' agreements do not constitute such direct evidence, and are "as consistent with permissible competition as with illegal conspiracy [and do] not, standing alone, support an inference of antitrust conspiracy." *Matsushita*, 475 U.S. at 588, 106 S.Ct. 1348 (citing *Monsanto*, 465 U.S. at 764, 104 S.Ct. 1464); *see also Citric Acid*, 191 F.3d at 1094. Toscano presented no evidence " 'that tend[ed] to exclude the possibility' that the alleged conspirators acted independently." *Id.* He failed to clear the *Matsushita* hurdle.

We have considered Toscano's remaining arguments and find them without merit. Notwithstanding Toscano's contentions, the district court did not improperly apply a "rule of reason" analysis to determine whether a section 1 agreement existed, and it did not violate California's parol evidence rule in concluding that the contracts provided no direct evidence of local sponsors' influence over the drafting of the PGA Tour's rules.

### B. Title Sponsors

■ Except for Royal Caribbean Cruises, which acted as both a local and title sponsor, the title sponsor defendants[5] had no contracts with the PGA Tour. Instead, they contracted directly with local sponsors, although some of their contracts referenced PGA Tour rules and regulations. For example, American Express's contract stated that the local sponsor would "insure that the Tournament fully complies with the terms and conditions set forth in the" Senior PGA Tour's agreement with the local sponsor, which was attached as an exhibit. Ralph's Grocery Company's contract stated that the local sponsor would use its "best efforts" to "cause the Tournament to meet the rules and standards of the Senior PGA TOUR," and Ralph's agreed it would comply with "the rules and standards of the Senior PGA TOUR." But these contracts demonstrate even less involvement with the PGA Tour and its rules than do the local sponsors' contracts, and provide no evidence of a section 1 violation.

### IV.

Although the contracts between the parties are direct evidence of agreements, neither those agreements, nor any other evidence, constitute direct evidence of an agreement for concerted action in restraint of trade in violation of section 1 of the Sherman Act. To the extent Toscano presented circumstantial evidence of such an agreement, that evidence fails to clear the *Matsushita* hurdle. The contracts establish only that the defendants agreed to sponsor tournaments in accordance with PGA Tour rules and regulations. The defendants played no role in the creation or enforcement of those rules and regulations, and they acted independently and consistent with permissible business practice in accepting the package the PGA Tour offered. The district court correctly

---

**5.** The title sponsors are American Express Travel Related Services, Inc., Countrywide Credit Industries, Inc., FHP Healthcare (now known as PacifiCare of California), Franklin Quest Co. (now known as Franklin Covey Co.), Hyatt Corporation, LG Group, Paine-Webber, Inc., Raley's, Ralph's Grocery Co., The Scotts Company, Transamerica Corporation, TruGreen L.P. dba Tru–Green Chem-Lawn, General Motors Corporation, and Royal Caribbean Cruises, Ltd.

granted summary judgment in favor of the local and title sponsors.

AFFIRMED.