**Yolanda PALACIO**

v.

**PROGRESSIVE INSURANCE COMPANY**

No. CIV.01–03654 GHK.

United States District Court, C.D. California.

Aug. 21, 2002.

KING, District Judge.

**PROCEEDINGS: Cross–Motions for Summary Judgment**

This matter is before the court on the parties' cross-motions for summary judgment. The motions are fully briefed and appropriate for resolution without oral argument. *See* Fed.R.Civ.P. 78; Local Rule 7–15. After fully considering all pertinent papers filed herewith, we rule as follows:

## I. Background

Plaintiff Yolanda Palacio ("Palacio") asserts four claims against Progressive Insurance Company ("Progressive"): (1) violation of California Labor Code § 1194 for failure to pay overtime wages; (2) violation of California Business and Professions Code § 17200 *et seq.* for unfair competition; (3) constructive wrongful termination in violation of public policy; and (4) violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 et seq., for failure to pay overtime wages. Her employment with Progressive commenced on January 5, 1998 and ended on March 2, 2001.

Plaintiff moves for summary judgment on claims one and four, including liquidated damages under 29 U.S.C. § 216(b). Progressive seeks summary judgment on the entire complaint.

## II. Summary Judgment

Summary judgment is appropriate when there is no dispute as to the material facts, and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *see also, e.g., Toscano v. Prof'l Golfers Ass'n,* 258 F.3d 978, 982 (9th Cir.2001); *County of Tuolumne v. Sonora Cmty. Hosp.,* 236 F.3d 1148, 1154 (9th Cir.2001) (*citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). We view the evidence in the light most favorable to the non-movant without determining issues of credibility or weighing evidence. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505.

## III. Analysis

### A. FLSA

#### 1. The FLSA in general

■ The FLSA exempts workers "employed in a bona fide executive, administrative, or professional capacity," 29 U.S.C. § 213(a)(1), from the standard overtime rules. 29 U.S.C. § 207(a)(1). The Secretary of Labor has broad discretion to "define and delimit" the scope of the exemption. *See Webster v. Pub. Sch. Employees of Wash., Inc.,* 247 F.3d 910, 914 (9th Cir.2001). The Secretary's regulations have the force of law, while the interpretative regulations are treated with deference. *Copas v. E. Bay Mun. Util. Dist.,* 61

F.Supp.2d 1017, 1020 (N.D.Cal.1999); *see also Webster*, 247 F.3d at 914.

### 2. Burden of establishing an exemption

■ Progressive has the burden of establishing an applicable exemption. *Bothell v. Phase Metrics, Inc.*, 299 F.3d 1120, 1124–25 (9th Cir.2002); *Webster*, 247 F.3d at 914. We construe exemptions narrowly against employers, requiring employment positions to "plainly and unmistakenly [fall] within their terms and spirit." *Id.* (*quoting Klem v. County of Santa Clara*, 208 F.3d 1085, 1089 (9th Cir.2000)). In this case, Progressive contends that Palacio's position as a claims representative falls within the administrative employee exemption.

### 3. The administrative exemption

■ To establish the administrative exemption, Progressive must overcome the "salary" and "duties" tests. *See Copas*, 61 F.Supp.2d at 1020. Both parties agree that Palacio's former position passes the salary test. The issue is whether the position meets the duties test.

We apply the "short" duties test because Palacio made more than $250.00 per week, 29 C.F.R. § 541.2(e)(2); *Bothell*, at 1124–25. Under the short test, if Palacio's primary duties consisted of the "performance of office or nonmanual work directly related to management policies or general business operations of" Progressive or its customers, and "include[d] work requiring the exercise of discretion and independent judgment, [Palacio] shall be deemed to meet all the requirements" of the administrative exemption. 29 C.F.R. § 541.2(a) & (e)(2); *Bothell*, at 1125; *see also* 29 C.F.R. §§ 541.201–08.

#### a. *Office or nonmanual work*

Palacio testified that over ninety-five percent of her time was spent in the office. *See* Pl.'s Statement of Uncontroverted Facts in Opp'n to Def.'s Mot. ("Pl.'s Opp'n Facts") ¶¶ 58, 92. Clearly, she satisfies this prong of the exemption.

#### b. *Work directly related to management policies or general business operations*

The phrase directly related to management policies or general business operations describes work (1) "relating to the administrative operations of a business as distinguished from 'production' " (2) that is of "substantial importance to the management or operation of the business . . . ." 29 C.F.R. § 541.205(a). When interpreting the definition of directly related to management policies with respect to insurance claims adjusters, courts have taken two different approaches.

#### i. *The straightforward approach*

Under the straightforward approach, the test of "directly related" is "met by many persons employed as advisory specialists and consultants of various kinds, [such as] . . . claim agents and adjusters . . . ." *See* 29 C.F.R. § 541.205(c)(5); *Bratt v. County of L.A.*, 912 F.2d 1066, 1069–70 (9th Cir.1990) (noting insurance claims agents and adjusters meet the directly related test); *Copas v. E. Bay Mun. Util. Dist.*, 61 F.Supp.2d 1017, 1021–22, 1025 (N.D.Cal.1999) (*citing Bratt*, 912 F.2d at 1069–70); *see also Haywood v. N. Am. Van Lines, Inc.*, 121 F.3d 1066, 1072 (7th Cir.1997) (stating that "claims agents and adjusters . . . are specifically mentioned by the regulations as meeting the 'directly related' test."). Of course, we do not look at job titles alone, as titles may not reflect the nature of an employee's duties. *See* 29 C.F.R. § 541.201(b).

In this case, Palacio did in fact work as a claims agent. She assessed liability, weighed evidence, determined credibility, reviewed insurance policies, negotiated with attorneys and claimants, and made recommendations to management based on

skills, knowledge and training acquired over the course of several years. *See, e.g.,* Pl.'s Statement of Uncontroverted Facts ¶¶ 4–8, 13–15; Pl.'s Opp'n Facts ¶¶ 6, 13,[1] 17, 19, 21,[2] 24, 26, 27, 29, 31–38, 42, 44, 46–48, 50, 51, 54, 58–61; Pl.'s Objections to Evidence ¶ 4 ("[Palacio] did in fact make coverage decisions/recommendations during the course of her employment."). Therefore, she functioned as a claims agent and/or adjuster and, her duties were "directly related" for purposes of the FLSA.

### ii. The duties approach

The interpretive guidelines provide separate definitions for the two components of "directly related." Section 541.205(b) elaborates upon the administrative versus production dichotomy while section 541.205(c) relates to the "substantial importance" component. The courts adopting the straightforward approach, i.e., that "the test of 'directly related['] . . . is met by . . . claims agents and adjusters[,]" rely upon language from § 541.205(c). However, the language in § 541.205(c) may merely establish that claims agent and adjusters are of "substantial importance" to a business, not that their work is necessarily directly related to business management. *See Reich v. John Alden Life Ins. Co.,* 126 F.3d 1, 9 (1st Cir.1997) (stating claims agents and adjusters generally meet the "substantial importance" test); *Spence v. Grange Mut. Cas. Co.,* 1981 WL 3378, *3–4 (1981) (noting that § 541.205(c)(5) relates to the second element of "directly related"). This closer reading of the regulations is consistent with the Ninth Circuit's policy of construing exemptions narrowly against employers. *See Bothell v. Phase Metrics, Inc.,* 299 F.3d 1120, 1124–25 (9th

Cir.2002); *Webster v. Pub. Sch. Employees of Wash., Inc.,* 247 F.3d 910, 914 (9th Cir.2001).

■ Under this latter approach, Progressive still has the burden of showing that Palacio's duties as a claims agent and/or adjuster were otherwise directly related to its management policies or general business operations. This typically, but not always or exclusively, requires proof that the employee's duties related "to the administrative operations" of the business as distinguished from the production aspects. *See* 29 C.F.R. § 541.205(a); *Bothell,* at 1126. Stated another way, the FLSA distinguishes between employees who perform duties connected with "running the business itself" and those engaged in the production of the very goods or services the employer offers to the public. *See Bothell,* at 1127–28; *see also Webster,* 247 F.3d at 916 ("Administrative work refers to the running of a business, as opposed to the day-to-day carrying out of its affairs.") (*quoting Bratt,* 912 F.2d at 1070) (internal quotations omitted); *Reich,* 126 F.3d at 9.

■ Unless an employee squarely falls on the production side of the line, the administrative/production dichotomy constitutes "but one analytical tool, to be used only to the extent it clarifies the analysis." *Bothell,* at 1126. The dichotomy serves "as a tool toward answering the ultimate question, whether work is 'directly related to management policies or general business operations,' not as an end in itself." *Id.* at 1127–28 (internal citation omitted). Ultimately, the administrative exemption describes the "servicing" of a business, for example, "advising the management, plan-

---

1. Palacio does not object to ¶ 13 to the extent her duties included "interviewing, determining liability, evaluating, and settling claims."

2. Palacio does not object to ¶ 21 to the extent she interviewed witnesses, determined credibility, and assessed witness potential. Though she used a script for interviews, follow-up questions were not scripted. *Id.* ¶ 22.

ning, negotiating, [and] representing the company . . . ." 29 C.F.R. § 541.205(b); *see also Bothell*, at 1126; *Webster*, 247 F.3d at 916. Thus, an employee who negotiates with clients and settles damage claims on behalf of an employer engages in duties consistent with the servicing of a business even though those activities can be viewed as ancillary to the provision of a good or service. *See Bothell*, at 1126 (citing *Haywood v. N. Am. Van Lines, Inc.*, 121 F.3d 1066, 1072 (7th Cir.1997));

In this case, Palacio's duties were related to the "servicing" of Progressive's business. *See generally* evidence cited in *supra* section III.A.3.b.i. Whether or not she exercised independent authority to settle claims above a certain limit, she regularly and continually represented Progressive during negotiations with attorneys and claimants. *See, e.g.*, Pl.'s Opp'n Facts ¶¶ 16, 31, 33, 34, 36, 50, 59, 61. Moreover, she had absolute authority to settle within her limits, which included approximately ten percent of her cases. *See id.* ¶ 47. She also regularly advised management regarding claims handling and related matters. *See id.* ¶¶ 19, 26, 27, 29, 38, 44. Taken together, these are the types of activities contemplated as servicing a business, and thus meet the "directly related" test. *See Bothell*, at 1126; *Bratt v. County of L.A.*, 912 F.2d 1066, 1069–70 (9th Cir.1990) (noting claims agents and adjusters are examples of employees "servicing" a business).

Even taking a narrow view of the administrative/production dichotomy, we still conclude that Palacio was an administrative employee. Progressive is not in the business of claims handling. Rather, it is in the business of writing and selling automobile insurance. Def.'s Reply to Pl.'s Statement of Genuine Issues ("Def.'s Facts") ¶ 1. Claims handling occurs within a functional department[3] as a type of ancillary customer service. *See id.* ¶ 4. "The vast majority of Progressive's customers never make a claim against the policy they purchase and therefore never come into contact with any claims personnel." *Id.* ¶ 2.[4] As a claims representative, Palacio did not produce the very goods or services that Progressive offered to the public.

Regardless, we need not rely upon such a technical application of the administrative/production dichotomy. *See Bothell*, at *1127–28 (disapproving any reasoning that only considers "a company's 'primary' marketplace offering" or automatically exempts employees who " 'perform ancillary customer service' work"). The evidence establishes that Palacio was "advising the management, planning, negotiating, [and] representing" Progressive throughout her employment and generally "servicing" the business. 29 C.F.R. § 541.205(b).

### iii. Primary duties

█ Progressive must also establish that Palacio's "directly related" duties were her primary duties. 29 C.F.R. § 541.2(a)(1), (e)(2). Primary duties generally occupy over fifty percent of an employee's time. *See* C.F.R. §§ 541.103, 541.206(b). When less than fifty percent, we consider, among other things, the relative importance and frequency of the relevant duties to the other activities.

Here, Palacio's "directly related" duties were her primary duties. Cumulatively, she spent more than half of each day

---

**3.** Palacio objects to the description of claims handling as a "functional department" based on a Progressive publication titled "Progressive: California Standard Operating Procedures." Pl.'s Evidence in Opp'n, Ex. 3. In particular, she cites the preamble, which describes the "mission of Progressive's Claims organization . . . ." *Id.* at p. 6. This document is not evidence that Palacio was employed by an entity in the business of claims handling.

**4.** Palacio purports to dispute this fact without offering contrary evidence.

communicating with attorneys, witnesses, doctors, and health-care providers. Pl's Opp'n Facts ¶¶ 35–37, 59–61. She was "in constant negotiation of 95% of the claims assigned to her on a daily basis." *Id.* ¶ 31. Before commencing negotiations, she would constantly evaluate claims. *Id.* ¶ 32. In contrast, clerical duties never occupied more than approximately twenty percent of her time. *Id.* ¶¶ 62, 64.

### iv. Summary of "directly related"

Consequently, we conclude that Palacio's primary duties were directly related to management policies or general business operations.

### c. Exercise of discretion and independent judgment

Since Palacio is under the "short" test, her duties only need to "include" the exercise of discretion and independent judgment. 29 C.F.R. § 541.2(e)(2); *see also* *O'Dell v. Alyeska Pipeline Serv. Co.*, 856 F.2d 1452, 1454 (9th Cir.1988). The duties need not "customarily or regularly" entail such judgment. *Id.; see also O'Dell* 856 F.2d at 1454.

Discretion and independent judgment involve "the comparison and the evaluation of possible courses of conduct and acting or making a decision after the various possibilities have been considered." 29 C.F.R. § 541.207(a). It implies "the authority or power to make an independent choice, free from immediate direction or supervision and with respect to matters of significance." *Id.* "The fact that an employee's decisions may be subject to review and that upon occasion the decisions are revised or reversed after review does not mean that the employee is not exercising discretion and independent judgment." 29 C.F.R. § 541.207(e); *see also Copas v. E. Bay Mun. Util. Dist.*, 61 F.Supp.2d 1017, 1026 (N.D.Cal.1999).

In this case, Palacio's duties included the exercise of discretion and independent judgment. Her settlement authority var-

ied between $5,000 and $7,500. Palacio Decl. ¶ 5. For the ten percent of claims that fell within her limit, "she had complete control of the negotiation and settlement." *See* Palacio Decl. ¶ 5; Pl's Opp'n Facts ¶¶ 25, 47. Though she needed approval for larger claims, her recommendations regarding initial offers for such claims were accepted half of the time, and once set, she generally did not need to seek approval for further increases. Pl.'s Opp'n Facts ¶¶ 27, 29. Hence, she exercised meaningful discretion and judgment within her settlement authority, as well as considerable discretion for larger claims.

In general, over half her time was spent negotiating with claimants and attorneys. Negotiations demand more than the bare application of learned skills in conformance with prescribed procedures. *See* 29 C.F.R. § 541.207(c)(1). For negotiations, Palacio had no script to rely upon and would sometimes change her approach during the course of negotiations. Pl.'s Opp'n Facts ¶ 28. "While Progressive issued guidelines for adjusting claims, those materials ... did not provide" Palacio with an answer as to what would be a proper amount to settle for within an applicable limit. Pl.'s Opp'n Facts ¶ 53. Thus, the act of negotiating itself involved the exercise of discretion and judgment.

To the extent the FLSA could be interpreted to require the exercise of discretion customarily and regularly, Progressive has still met its burden as a matter of law. *Compare* 29 C.F.R. § 541.2(a), (b), (e)(2) *with* 29 C.F.R. § 541.207(g); *see also Bothell v. Phase Metrics, Inc.*, 299 F.3d 1120, 1129 (9th Cir.2002) (considering whether an employee under the short test "customarily and regularly exercised discretion"). As noted above, Palacio devoted the majority of her daily time to negotiating and handling claims. The fact that Progressive often required Palacio to obtain supervisor approval does not alter the fact that

Progressive relied upon her to exercise discretion and independent judgment in the management of claims and her dealings with claimants.

### d. Summary of administrative exemption

Progressive has met its burden that Palacio, as a claims representative, fell within the FLSA's administrative employee exemption as a matter of law.

### 4. Liquidated damages

Given our conclusion above, Palacio cannot recover liquidated damages under the FLSA as a matter of law.

## B. California Labor Code § 1194

### 1. California administrative exemption

The Industrial Welfare Commission ("Commission") is authorized to set the "maximum hours of work and the standard conditions of labor" for California employees. Cal. Labor Code § 1198. Like its predecessors, the Commission does so through the passage of wage orders, which it has the power to rescind or amend upon its own motion or after a petition. *Id.* §§ 1173, 1182.5, 1182. Here, the parties dispute whether Wage Order 4 required Progressive to pay overtime wages for instances when Palacio worked more than eight (8) hours in a day or forty (40) hours in a workweek. 8 Cal.Code Reg. § 11040(3).

■ Throughout the period relevant to Palacio's overtime claim, January 5, 1998 until March 2, 2001, Wage Order 4 has

contained an exemption for "persons employed in administrative ... capacities ...." *Id.* § 11040(1)(A). However, the Commission amended the administrative exemption in Wage Order 4 twice during Palacio's employment with Progressive. Consequently, we consider each version of Wage Order 4's exemption.

### 2. January 5, 1998—September 30, 2000

From January 1, 1998 through September 30, 2000, Wage Order 4 ("Wage Order 4–1998") stated that:

No person shall be considered to be employed in an administrative ... capacity unless one of the following conditions prevails:

... The employee is engaged in work which is primarily intellectual, managerial, or creative and which requires exercise of discretion and independent judgment, and for which the renumeration is not less than $ 1150.00[5] per month[.]

*Id.* [footnote added]

■ As explained more fully above, Palacio's duties were primarily intellectual and required the exercise of discretion and independent judgment. *See supra* section III.A.3.a, b.iii, c. For instance, she spent over half of her work-day in negotiations with claimants and attorneys. Yet these qualities represent the minimum threshold and are not sufficient in and of themselves. *See Bell v. Farmers Ins. Exchange,* 87 Cal.App.4th 805, 812–815, 819, 105 Cal. Rptr.2d 59 (2001).[6] Progressive still must

---

**5.** The parties agree that Plaintiff earned more than $1,150.00 per month throughout the relevant period.

**6.** *Bell* was an interlocutory appeal, and Progressive argues that it cannot be relied upon because "the entire case has [since] been appealed ...." Def.'s Mot at 23. The California Supreme Court and United States Supreme Court denied review of the *Bell* decision. *See*

*Bell v. Farmers Ins. Exchange,* 87 Cal.App.4th 805, 105 Cal.Rptr.2d 59 (2001), rev. denied, Supreme Court Minute 06–20–2001 (Cal. June 20, 2001), cert. denied, 534 U.S. 1041, 122 S.Ct. 616, 151 L.Ed.2d 539 (2001). The law of the case doctrine prevents parties, such as those in *Bell,* from appealing a second time an issue decided on the merits in the same case by an earlier appellate court. *See Griset*

establish as a matter of law that Palacio's duties were otherwise administrative in nature. *See id.*

When construing the term administrative, California looks to federal authorities for "insights and a general methodology." *See id.* at 814–816, 820, 105 Cal.Rptr.2d 59 (noting that California state agencies also consider federal decisions persuasive, if not directly applicable). The only California authority cited by the parties, or discovered by the court, dealing with the definition of "administrative" in Wage Order 4–1998 relied exclusively on federal authorities interpreting the FLSA's "directly related to management policies or general business operations" test. *See id.* at 820–29, 105 Cal.Rptr.2d 59.

To the extent that federal authorities provide guidance and a general methodology, we already concluded that Palacio's duties were "directly related." *See supra* section III.A.3.b. But we cannot ignore the fact that *Bell* reached the opposite conclusion upon considering somewhat similar circumstances. Under the law of the Ninth Circuit, we must follow *Bell* absent "convincing evidence" that California's Supreme Court would decide the issue differently. *Bills v. United States Fid. & Guar. Co.*, 280 F.3d 1231, 1234 n. 1 (9th Cir.2002). Based on the record before us, we do not find compelling reasons that would lead us to believe that the California Supreme Court would reach a different conclusion. While some aspects of *Bell's* reasoning do not control, the ap-

plicable portions preclude summary judgment in this instance.

Following the FLSA, *Bell* first considered the administrative/production dichotomy and then addressed the question of whether the duties at issue were of substantial importance. *Bell's* reasoning on the administrative/production dichotomy is distinguishable. *Bell* found "it particularly significant that [the defendant insurance company] performed a substantial amount of claims handling work for other related companies ... and [was] reimbursed for the cost of th[ose] services." *Id.* at 824, 105 Cal.Rptr.2d 59. The insurer in *Bell* did not even "carry out the sales activities ordinarily involved in operating an insurance business." *Id.* at 823, 105 Cal.Rptr.2d 59. *Bell's* conclusion that claims representatives were production workers thus went hand-in-hand with the undisputed evidence that claims handling constituted the insurance company's business rather than an ancillary support service related to the products it sold. Here, Progressive sells insurance policies, not claims handling services.[7]

However, *Bell* did not end its analysis with the administrative/production dichotomy. Similar to the Ninth Circuit, *Bell* recognized "that the administrative/production dichotomy is a somewhat gross distinction .... In the absence of detailed [California] interpretative guidelines comparable to those in federal cases," *Bell* recommended exercising "great caution" when ruling on motions for summary judgment. *Id.* at 826–27, 105 Cal.Rptr.2d 59.

*v. Fair Political Practices Com.,* 25 Cal.4th 688, 701, 107 Cal.Rptr.2d 149, 23 P.3d 43 (2001). *Bell* decided the state overtime claim on the merits, the decision is now final, and therefore *Bell* is not subject to reversal by any pending appeal.

**7.** In addition, the defendant insurer in *Bell* was one corporation among a group of affili-

ated insurance companies. As a result, *Bell* focused on the activities conducted in the defendant's branch offices rather than "vaguely described business functions ... carried out elsewhere in the ... organization." *Id.* at 824–25, 105 Cal.Rptr.2d 59. Here, claims handling occurred within Progressive, not a separate corporate entity.

To verify its initial conclusion based on the dichotomy, *Bell* considered whether the claims representatives before it performed duties of substantial importance. The settlement authority of the plaintiffs in *Bell*, "[w]ith few exceptions, ... [was] set at $15,000 or lower, and often [was] $5,000 or lower." *Id.* at 828, 105 Cal. Rptr.2d 59. *Bell* considered this persuasive evidence that the "claims representatives ... [were] ordinarily occupied in the routine of processing a large number of small claims." *Id.* at 827–28, 105 Cal. Rptr.2d 59. On matters of greater importance, claims representatives merely conveyed information to supervisors. As a result, the claims agents' work was not of substantial importance and could not be deemed administrative. *Id.*

Because a low settlement authority constitutes persuasive evidence on the issue of substantial importance, we cannot grant Progressive's motion for summary judgment. Palacio's settlement authority never exceeded $7,500, which is similar to the level of authority mentioned in *Bell.* At the same time, we cannot grant Palacio's motion. *Bell* does not suggest that a settlement authority between $5,000 and $7,500 is dispositive. Unlike the defendant in *Bell,* Progressive has not admitted that *"the actual handling of the routine and unimportant may be delegated [to claims representatives], but questions of importance must be decided by the branch claims manager, and at a higher level by the regional claims manager." Id.* Nor has Palacio presented undisputed evidence that she merely functioned as a "conduit[ ] of information to supervisors" or as a "go-between" on matters of importance. *Id.* at 827–28, 105 Cal.Rptr.2d 59. The evidence shows that even when she needed approval, she made recommendations to her supervisors, and, depending on the issue, those recommendations were followed to varying degrees.

Consequently, triable issues of fact remain as to whether Palacio's duties satisfy the administrative exemption in Wage Order 4–1998. Accordingly, we **DENY** both parties' motions on the state overtime claim with respect to the period from January 5, 1998 through September 30, 2000.

**3. October 1, 2000—March 2, 2001**

■ Effective October 1, 2000 and January 1, 2001, the Commission substantially amended Wage Order 4 (Wage Order 4–2001).[8] Similar to the FLSA, Wage Order 4–2001 requires that an employee's duties or responsibilities include "[t]he performance of office or non-manual work directly related to management policies or general business operations ...." 8 Cal.Code Reg. § 11040(2)(a)(1) (2000); 8 Cal.Code Reg. § 11040(2)(a)(i) (2001). Tracking the language of the FLSA, an employee must also "customarily and regularly exercise[ ] discretion and independent judgment ...." *Id.* at § 11040(2)(c)(1) (2000); 8 Cal. Code Reg. § 11040(b) (2001). In fact, "[t]he activities constituting exempt work and non-exempt work shall be construed in the same manner as such terms are construed in the following regulations under the Fair Labor Standard Act ... 29 C.F.R. §§ 541.201–205, 541.207–208, 541.210, 541.215." *Id.* at § 11040(2)(d) (2000); 8 Cal.Code Reg. § 11040(2)(f) (2001).

Because the analysis of Wager Order 4–2001 mirrors the analysis under the FLSA, we conclude that Progressive has satisfied its duty as to the above-titled elements as a matter of law. *See supra* section III.A. However, Wage Order 4–2001 contains ad-

---

8. There are no substantive differences between the requirements of the administrative exemption in the October 1, 2000 and January 1, 2001 amendments. Hence, we consider them together.

ditional language not expressly included as a separate element under the FLSA. To be exempt, the employee must also be someone:

Who regularly and directly assists a proprietor, or an employee employed in a bona fide executive or administrative capacity (as such terms are defined for purposes of this section), or

... who performs under only general supervision work along specialized or technical lines requiring special training, experience, or knowledge, or

... who executes under only general supervision special assignments and tasks ....

8 Cal.Code Reg. § 11040(2)(c)(1)-(3) (2000); 8 Cal.Code Reg. § 11040(2)(c)-(e) (2001).

Because neither party directly addressed this language, we cannot award summary judgment for either party on the state overtime claim relating to the period of October 1, 2000 through March 2, 2001.

## C. Constructive wrongful termination

### 1. General function

 Constructive discharge allows employees who resign to bring wrongful discharge claims as if they were involuntarily terminated. *Turner v. Anheuser–Busch, Inc.,* 7 Cal.4th 1238, 1244–45, 32 Cal.Rptr.2d 223, 876 P.2d 1022 (1994). In effect, the employer coerces the employee to resign. *See Mullins v. Rockwell,* 15 Cal.4th 731, 737, 740, 63 Cal.Rptr.2d 636, 936 P.2d 1246 (1997). Because we treat such cases as terminations, Palacio must prove an underlying contract or tort violation in connection with the "termination." *Turner,* 7 Cal.4th at 1251, 32 Cal.Rptr.2d 223, 876 P.2d 1022. Here, Palacio alleges constructive discharge in violation of a fun-

damental public policy. *See id.* at 1252, 32 Cal.Rptr.2d 223, 876 P.2d 1022.

### 2. Prima facie case for constructive discharge

 To establish constructive discharge, Palacio

must plead and prove, by the usual preponderance of the evidence standard, that the employer either intentionally created or knowingly permitted working conditions that were so intolerable or aggravated at the time of the employee's resignation that a reasonable employer would realize that a reasonable person in the employee's position would be compelled to resign.

*Turner,* 7 Cal.4th at 1251, 32 Cal.Rptr.2d 223, 876 P.2d 1022.

#### a. Intolerability

 Every job entails frustrations, struggles and stress. *Turner,* 7 Cal.4th at 1247, 32 Cal.Rptr.2d 223, 876 P.2d 1022. Single, trivial or isolated incidents cannot generally support constructive discharge. *Id.* at 1247, 32 Cal.Rptr.2d 223, 876 P.2d 1022.[9] Adverse conditions must be "extraordinary and egregious," "unusually aggravated," or part of a "continuous pattern," such that any reasonable employee would feel compelled to resign rather than continue the employment relationship. *Id.* 1246–48, 32 Cal.Rptr.2d 223, 876 P.2d 1022; *accord Mullins,* 15 Cal.4th at 737, 63 Cal.Rptr.2d 636, 936 P.2d 1246. The conditions must be unreasonably harsh compared to those experienced by coworkers. *Id.* at 1247; *accord King v. AC & R Advertising,* 65 F.3d 764, 768 (9th Cir.1995). The length of time an employee remains on the job is one relevant factor in deter-

---

**9.** A single egregious act can give rise to constructive discharge if it is sufficiently aggravated, such as a violent crime. *Id.* at 1247 n. 3, 32 Cal.Rptr.2d 223, 876 P.2d 1022. However-

er, Palacio does not contend this is such a case, nor is there evidence of any such aggravated conduct.

mining whether a reasonable person would consider the conditions intolerable. *Turner*, 7 Cal.4th at 1254, 32 Cal.Rptr.2d 223, 876 P.2d 1022; *see also Mullins*, 15 Cal.4th at 740, 63 Cal.Rptr.2d 636, 936 P.2d 1246 (noting that "the longer the employee delays ... resignation, the more difficult it may be to prove" intolerability).

■ Intolerability is typically reserved for the jury, *Huskey v. City of San Jose*, 204 F.3d 893, 900 (9th Cir.2000), which can consider "all of the circumstances of the employment relationship." *Thompson v. Tracor Flight Sys., Inc.*, 86 Cal.App.4th 1156, 1169 n. 1, 104 Cal.Rptr.2d 95 (2001). Still, we can in certain circumstances conclude as a matter of law that conditions were not sufficiently severe to warrant resignation. *See, e.g., Huskey*, 204 F.3d at 901 (holding city attorney failed to state claim—he was told he would be "referred to counseling," assigned undesirable cases, and given "the cold shoulder" by colleagues); *Turner*, 7 Cal.4th at 1255, 32 Cal.Rptr.2d 223, 876 P.2d 1022 (holding the alleged misconduct, taken together, did not constitute a "pattern of harassment or aggravating conditions"); *King*, 65 F.3d at 768 (insufficient as matter of law even though employee's status changed to at-will, managerial responsibilities reduced, and compensation plan altered, including lower pay and bonus).

■ "[A] poor performance rating, or a demotion, even when accompanied by a reduction in pay, does not by itself trigger a constructive discharge," as employers must be able to "review, criticize, demote, transfer, and discipline employees." *Turner*, 7 Cal.4th at 1247, 1255, 32 Cal.Rptr.2d 223, 876 P.2d 1022 (*quoting Cole v. Fair Oaks Fire Protection Dist.*, 43 Cal.3d 148, 160, 233 Cal.Rptr. 308, 729 P.2d 743

(1987)). Though not encouraged, "employers have the right to unfairly and harshly criticize employees, to embarrass them in front of other employees, and to threaten to terminate or demote the employee." *Thompson*, 86 Cal.App.4th at 1171, 104 Cal.Rptr.2d 95.

Here, as a matter of law, Palacio's evidence does not reveal "extraordinary and egregious" working conditions or that she worked under "harsh" conditions relative to coworkers. In the interests of simplicity, we organize the evidence chronologically.

In November 2000, following a performance review, Palacio's authority was reduced from $7,500 to $6,000. It is undisputed that other claims representatives had their authority lowered, though Palacio appears to be the only one under her particular supervisor. This reduction in authority would not lead a reasonable employee to resign and is the type of event that regularly occurs in employment settings. Moreover, Progressive lowered her settlement authority before she requested overtime pay.

Palacio next complains that on January 8, 2001, she was told to update her timecards ASAP. Even if maliciously motivated by her letter relating to overtime pay, this request is not unusually harsh or egregious. Plaintiff merely notes that "[t]imecards, particularly for employees who were told they were exempt, had never been a priority before." Palacio Opp'n Decl ¶ 4. She does not claim that filling out timecards involved extensive additional work or represented an unwieldy burden to which other employees were not subjected.

On January 19, 2001,[10] Palacio received an e-mail that she claims falsely accused

---

**10.** Palacio's declaration states that she received the e-mail on January 10, 2001. Her motion states the e-mail was dated January 19, 2001, consistent with the date on the e-

mail itself. Accordingly, we adopt the latter date. In any event, the precise date is immaterial.

her of being behind in her work. The e-mail states "I see you still have some Newly Assigned's [sic] on your back diary. No new claims for you today. See if you can't get caught up on those..... If it looks like time management is a big issue for you, we'll work on that and maybe even look at some training that we could put you through if you're open to that. [paragraph break] Hang in there. We'll get you back in control! :-" Pl.'s Evid. in Opp'n to Def.'s Mot. ("Pl.'s Evid."), Ex. 7.[11] Like the evidence above, this e-mail is an innocuous statement by a supervisor. Even if the statement is inaccurate, it is accompanied by an offer for further training and words of encouragement. While an undeserved critical comment may be frustrating, it is not sufficiently harsh or oppressive to constitute constructive discharge.

On February 2, 2001, Palacio received a performance review of "Meets" expectations and was notified of a four percent raise. If a poor performance rating combined with a reduction in pay cannot support constructive discharge, *Turner*, 7 Cal.4th at 1247, 32 Cal.Rptr.2d 223, 876 P.2d 1022, an average evaluation combined with a pay increase, however modest, cannot raise the specter of constructive discharge. Palacio does not offer evidence that she was singled out for this treatment. Her performance rating was consistent with her prior evaluations, both in terms of her overall rating and the specific comments contained therein about the need to improve time management. She also does not offer evidence that other employees with similar ratings received larger raises. Her subjective perception of the evaluation and raise as retaliatory does not convert either into an intolerable employment condition.[12]

On February 5, 2001, Palacio's supervisor sent her an e-mail indicating that in-house counsel had examined some of her claims files and found them deficient in several respects. At the time, the in-house counsel knew about Palacio's overtime claim. She felt the criticism was unfair, especially since the in-house counsel only reviewed two of her over one hundred files. "By this time, I believed I was being set up for termination." Palacio Opp'n Dep. ¶ 6. The February 5, 2001 e-mail from her supervisor reads:

Chris [O'Rourke, the in-house counsel,] has randomly reviewed some of our files in regard to the initial handling assessments. Here is his feedback on the two he reviewed of yours. With Cindy's reassignments, and those files not being in the best of shape, the past part of the month was tough. Nevertheless, I want you to have his feedback. Feel free to ask me if you have any questions.

.... [regarding the first file]

2.... No revision of ECLDD, no clear plan addressing liability and damages needs.

3. Working file regularly, but direction not clear (what will be missed?)

4. BI Summary not completed

5. Attorney name as "L/O"

6. Not maintaining diary (working but not deleting old one or setting proper new one)

... [regarding the second file]

....

2. No 2 day [sic] diary for receipt of hard file

3. no initial review

---

11. An earlier e-mail, dated December 29, 2000, also suggested that Palacio "catch up on [her] diary and mail."

12. Palacio has not brought a stand-alone claim for retaliation.

4. Not maintaining diary (last not deleted, new one not set)

Pl.'s Evid. in Opp'n to Def.'s Mot, Ex. 9.

First, the criticism is consistent with prior comments from supervisors. Moreover, Palacio does not offer evidence that the comments are false. At most, the review may not have been representative of Palacio's work. Yet every job entails some frustrations, annoyances and stresses, especially when work is periodically evaluated.[13] So while possibly unfair to some extent, the review was not adequately egregious or aggravated to spur a reasonable employee to resign.

On February 9, 2001, Palacio wrote a letter to Mr. Kiedaisch, her supervisor, with a copy to Human Resources, to complain about her pay increase and the method employed to determine her annual review. Pl.'s Evid. in Opp'n to Def.'s Mot, Ex. 10. She accused Mr. Kiedaisch of retaliating against her for the overtime claim by awarding a four percent raise. *Id.* Moreover, she believed the random selection of seventeen files for the annual review did not adequately represent her work. *Id.* She asked Mr. Kiedaisch to "re-evaluate your assessment of my work and provide me with a written response by February 13, 2001." *Id.* Human Resources did not contact her. However, Mr. Kiedaisch met with her on February 15, 2001 to discuss her letter.

Palacio's objections to the pay increase and merit review, however genuine, do not rise to the level of constructive discharge. We have no evidence that the method of evaluation applied to her was different from that used with other employees. The fact that she interpreted the evaluation and raise as retaliatory does not make them so. Furthermore, the lack of re-sponse from Human Resources does not support her claim since she only gave them four days to reply, did not specifically request a meeting with them in her letter, and her supervisor met with her within six days to address the issues raised in the letter.

In general, Palacio objects to the increased supervision in 2001. She was required to fill out daily timecards, a daily log, and route all mail through her supervisor. However, her supervisor gave her notice in December of the upcoming additional supervision and explained at that time that it was to assist her with her time management. While this level of supervision may offend an employee who considers herself experienced and knowledgeable, it is not extraordinary enough to warrant resignation. Moreover, Palacio does not establish that she alone was exposed to additional scrutiny.

Finally, Palacio complains of the failure to pay overtime for three years. An employee required to work excessive hours without pay might reasonably find themselves compelled to resign for health or financial reasons. Palacio admits in her declaration that "I am a hard worker and working long hours is no problem for me." Palacio Decl. ¶ 2. While she notes an increase in work by the middle of 2000, *see id.*, she does not claim that the hours made work intolerable. In any event, the hours demanded of Palacio were no different than the hours demanded of coworkers. She was not subjected to harsh treatment relative to co-workers. Therefore, Progressive's alleged failure to pay overtime wages did not render continued employment intolerable.

Even taking all of these separate incidents and working conditions together and

---

**13.** The e-mail also suggests that Palacio was not the only employee reviewed in this man-ner.

viewing the evidence in the light most favorable to Palacio, we nevertheless conclude that Progressive is entitled to judgment as a matter of law; the evidence could not support a finding that her work conditions were so intolerable that a reasonable employee would have felt compelled to resign rather than continue the employment relationship.[14]

### b. Actual knowledge

Since constructive discharge functions as involuntary termination, the evidence must show that Progressive essentially coerced Palacio to resign, albeit indirectly through the use of intolerable conditions. *Turner v. Anheuser-Busch, Inc.*, 7 Cal.4th 1238, 1249-40, 32 Cal. Rptr.2d 223, 876 P.2d 1022 (1994); *accord Mullins v. Rockwell Int'l Corp.*, 15 Cal.4th 731, 737, 63 Cal.Rptr.2d 636, 936 P.2d 1246 (1997). Progressive must have either deliberately created the intolerable conditions or knowingly failed to remedy them. *Turner*, 7 Cal.4th at 1249-40, 32 Cal. Rptr.2d 223, 876 P.2d 1022. Progressive cannot be liable on a theory of constructive knowledge. *Id.* at 1251, 32 Cal.Rptr.2d 223, 876 P.2d 1022. Either Progressive or persons who represent Progressive, such as officers, directors, or supervisors, must possess the requisite knowledge. *Id.*

Assuming all the events described in section III.C.2.a, when taken together, rendered employment intolerable, Palacio does not present evidence that Progressive knew of all of those conditions or intentionally created them. She arguably notified Progressive about some of the alleged intolerable conditions in two letters: (1) a letter from her attorney regarding unpaid overtime and (2) a letter to her supervisor about the performance evaluation and merit increase. She did not mention her decreased authority or the increased supervision, upon which she now relies. When limited to the conditions about which Progressive knew due to Palacio's complaints, we conclude that any failure to remedy those conditions would not have rendered continued employment intolerable.

### c. Summary of constructive discharge [15]

Palacio has not established that the employment conditions at Progressive were intolerable or that Progressive was aware of such intolerable conditions.

## D. Business & Professions Code § 17200

Because Palacio still has a pending state overtime claim, Progressive's motion for summary judgment is denied without prejudice on this claim.

## IV. Disposition

Accordingly, we hereby **GRANT** Progressive's and **DENY** Palacio's motions on the FLSA and constructive discharge claims. We **DENY** both parties' motions with respect to the state overtime claim. We **DENY** Progressive's motion on the § 17200 claim.

Within fourteen (14) days of the date of this order, the parties shall meet and confer to discuss the possibility of settlement. At the same time, the parties shall discuss whether either intends to file a motion on the state overtime claim for the period of

---

14. Progressive points out that Palacio chose to stay after giving two week notice on February 15, 2001, even though offered full pay for those two weeks regardless of whether she left immediately. This fact certainly bears on the issue of intolerability. Still, Palacio testified that she did not want to unfairly leave half-completed assignments for co-workers. Given this explanation, her decision to remain is not dispositive.

15. Because we conclude that Palacio was not effectively discharged, we need not consider whether any such discharge violated public policy.

October 1, 2000 through March 2, 2001. If either party wishes to file such a motion, it shall be in the form of a joint memorandum, not to exceed forty (40) pages in total, twenty (20) pages per side, and filed no later than forty (40) days after the date of this order. *See* Local Rule 37–2. The joint brief shall contain all the parties' arguments about the previously unaddressed language in Wage Order 4–2001. *See supra* section III.B.3. Furthermore, the parties shall jointly file a statement of undisputed facts and their supporting evidence.

**IT IS SO ORDERED**.