**James P. MITCHELL, Secretary of Labor, United States Department of Labor,**

v.

**BRANCH MOTOR EXPRESS COMPANY, a corporation.**

**Civ. A. No. 22012.**

United States District Court
E. D. Pennsylvania.
Nov. 25, 1958.

Louis Weiner, Deputy Regional Atty., U. S. Dept. of Labor, Chambersburg, Pa., for plaintiff.

Paul F. Barnes and Raymond A. Thistle, Jr., Philadelphia, Pa., for defendant.

VAN DUSEN, District Judge.

This case comes before the court on plaintiff's prayer to enjoin the defendant from alleged violations of the Fair Labor Standards Act (hereinafter called the "Act"), 29 U.S.C.A. § 201ff., through employing certain employees for more than forty hours per week without paying them overtime pay as required by the Act (29 U.S.C.A. § 207).

The following requests of the parties for findings of fact, as modified below, are adopted as findings of fact of the trial judge and are supplemented by the findings stated herein:

A. These paragraphs of plaintiff's Requests for Findings of Fact: 1-4; 5, with the word "handling" substituted for the word "production"; 6-10; 11, with parentheses inserted in the last sentence before the word "mostly" and after the word "consignees" and with the words "as well as" inserted in the same sentence before the word "telephone"; 12, with the second sentence reworded to read "He has five drivers making pickups and deliveries in Reading, each of whom makes an average of 6 to 8 calls, and ten to twelve drivers in the country around Reading, each of whom makes 2 to 3 calls, or a total of about 60 calls a day (N.T. 124, 125).", 13, with the words "shippers and" inserted before the word "drivers" in the second sentence; 14, with an "s" added to the word "trailer" in the two places this word appears in the last sentence; 15, with this language inserted after the word "it" in the second sentence: "(the background necessary for the job of dispatcher)"; 16-17; 18, with this sentence added at the end of the paragraph: "However, if the drivers prescribed by such contract are not available, the dispatcher has the discretion to hire such drivers as he selects and does hire such drivers."; 19, with the word "sometimes" inserted before the word "refer" in the first sentence; 20, with the first sentence deleted and the words "after making their own check as to such driver's qualifications" inserted after the word "list" in the second sentence and the words "except as stated above" inserted after the word "employees" in the next-to-the-last line; 21-23; 24, with the words "but Frederick tries to straighten out complaints which the drivers often present to him" substituted for the words "or complaints of driver" in the first line and the number "166" inserted in the parentheses; 25, with these words added at the end: "unless the need of such repairs is known to them."; 26-29; and 30, with the word "early"

substituted for the word "1958" in the first sentence of sub-paragraph c, the word "all" deleted from sub-paragraph f, and the following sentence added at the end of sub-paragraph f: "He must follow the instructions of the dispatcher as to which equipment to work on from time to time."

B. These paragraphs of defendant's Requests for Findings of Fact: 1–7; 8, with the words "and account for 90% of his time" deleted from the 10th and 11th lines, the word "sometimes" substituted for the word "often" in the 14th line, and the word "operation" substituted for the word "operator" in the 22nd line of page 4; 9, with the words "and in their absence" inserted at the end of the 6th sentence and the last sentence deleted; 10, with the first sentence deleted; and 11–13.

### I. The Dispatchers

Plaintiff has employed two dispatchers (among a total of approximately 99 employees) at its Reading, Pennsylvania, terminal for the period from prior to 1955 until the present. These men have worked from 52 to 62 hours per week [1] at a salary which has varied between $110 and $120 a week. The primary duties and responsibilities of these dispatchers are to supervise the pick-up and delivery of shipments in the Reading area and the arrangements for the transportation of such shipments to and from the Reading terminal over the routes approved by the Interstate Commerce Commission (hereinafter called "ICC") for use by defendant. In order to perform such duties and responsibilities, the dispatchers must use discretion and independent judgment in these matters, among others:

A. Planning and directing the local drivers as to the order, method (including type of vehicles to be used), and, occasionally, the routing to be used in making pick-ups and deliveries. [2]

B. Directions on the loading of the long-distance vehicles in order to insure safety, prevention of "back-tracking" (N. T. 56–7), and compliance with state weight limitations.

C. Directions for the maintenance readiness of the vehicles. [3]

D. Directions given to the platform supervisors and their men [4] in doing their work of loading, unloading, and storing the shipments (N.T. 103–4, 169–171, 184–5).

E. Disciplining, suspending, and recommending for discharge drivers and other employees who are not performing their work properly (cf. N.T. 110–11, 166–7).

F. Employing extra drivers in situations where more than the usual quantity of shipments necessitates the use of extra vehicles, which is a weekly occurrence when business is good. [5]

G. Determining the number and size of vehicles to be used.

1. Frederick reports to work at 6:30 A.M. and leaves about 6 P.M. Bausher starts to work at 2:30 P.M. and leaves between midnight and 2:30 A.M.

2. N.T. 83–6, 106–7, 167–8. The ICC does not prescribe routes for pick-ups and deliveries and the drivers call in to the dispatchers to get instructions, not only on what shipments to pick up but how to arrange their schedule in making their pick-ups and deliveries.

3. Although the mechanics are instructed in their techniques of repair and maintenance by the mechanical personnel, the dispatcher controls the garage foreman and his men in the order in which the work is to be done on the vehicles (N. T. 103, 131–2, 138, 180).

4. There are normally eight platform men in addition to the supervisor, but the dispatchers may use more or less (N.T. 108–9).

5. Cf. N.T. 22, 23, 25, 27, 165. The testimony indicates that, when business is good, this is a weekly occurrence. Since the drivers usually have to be secured at odd hours, those on the union list are often not available and the dispatchers must select competent drivers after checking their qualifications. One dispatcher testified that he did not follow the personnel procedures set out in defendant's manual (Exhibit P–15A), but that he hired these extra drivers in his own manner (N.T. 92, 93).

H. Straightening out complaints made by the drivers (N.T. 166).

I. Directions given to the long-distance drivers on safety measures required by the load (N.T. 15).

The dispatcher is in control of the major part of the business of the defendant in the Reading area (N.T. 60, 114). Although the Regional Manager and the Terminal Manager are superior in authority to the dispatcher,[6] neither of them are at the Reading office for even a majority of the working day and, in their absence, the dispatcher is in complete charge of the operation (N.T. 62, 126, 197). Therefore, more than half of the 9 A.M. to 5 P.M. workday and from 6:30 A.M. to 9:00 A.M. and from 5 P.M. to after midnight, the dispatcher is the highest official conducting the defendant's business at the Reading terminal. Even when the Terminal Manager is present, the dispatcher controls and supervises the defendant's transportation business in the Reading area, including the work of the drivers and platform workers.[6]

Mr. Frederick (one of the dispatchers) testified as follows (N.T. 147, 148, 188):

"And I take pickup calls, because I have to know what the shipper is shipping, the type of material, so I can send the type of trailer that is needed for that particular shipment and fit it into the operation where it is best fitted in.

"And, well, as the day goes along —every day is different. I mean, according to pickups and deliveries. I might use ten drivers one day, 20 drivers the next day, but that is up to me to decide, because I know how many loads I have to pick up and deliver.

6. The Regional Manager testified that the dispatcher acted in a supervisory capacity and that he had direct supervision over the office force (N.T. 236), but the Terminal Manager has the responsibility for the operation (N.T. 233). The Regional Manager only has time to supervise the Terminal Managers and the dispatchers. The Terminal Manager's main job is soliciting freight, which requires

* * * * * *

"Well, I see that the whole terminal is run as economical as it can be by myself and—because I have charge of the whole operation while I am on duty. In other words, I have charge of the whole Reading terminal.

"By Mr. Weiner:

"Q. Do you have charge of the whole Reading terminal, or do you have charge of the dispatching of the trucks from the Reading terminal? A. The whole Reading terminal.

* * * * * *

"Well, my most important duties are to set up and maintain the operation of the Reading terminal efficiently in the most economical way and to the best of my ability as I see fit."

■ The trial judge concludes that the defendant has sustained its burden of proving that the two dispatchers (Bausher and Frederick), working at the defendant's Reading terminal, are exempt from § 7(a) of the Fair Labor Standards Act (29 U.S.C.A. § 207(a)) under the following language of § 13 of that Act (29 U.S.C.A. § 213):

"The provisions of sections 206 and 207 of this title shall not apply with respect to (1) any employee employed in a bona fide executive (or) administrative * * * capacity * * * (as such terms are defined and delimited by regulations of the Administrator); * * *."

The trial judge's conclusion is based on the application of the regulations to the facts which he has found have been established as stated above. The more applicable provisions of the regulations are referred to below.

him to visit potential shippers. He is at his office 40 to 45% of the time he works. One dispatcher testified that, on occasions when he and the Terminal Manager had disagreed as to how much equipment was needed, his decision had been followed (N.T. 114–5). The Terminal Manager supervises the clerical workers at the Reading office.

29 C.F.R. § 541.2, which is in Subpart A, provides as follows:

"The term 'employee employed in a bona fide * * * administrative * * * capacity' in section 13(a)(1) of the act shall mean any employee:

* * * * * *

"*Provided*, That an employee who is compensated on a salary or fee basis at a rate of no less than $100 per week (exclusive of board, lodging, or other facilities), and whose primary duty consists of the performance of office or nonmanual field work directly related to management policies or general business operations of his employer or his employer's customers, which includes work requiring the exercise of discretion and independent judgment, shall be deemed to meet all of the requirements of this section."

29 C.F.R. § 541.99(c) provides, in part, as follows:

"The exempt or nonexempt status of any particular employee must be determined on the basis of whether his duties, responsibilities, and salary meet all the requirements of the pertinent section of the regulations in Subpart A of this part. * * * In any specific case it is the actual work performance, the responsibilities, and the salary of the individual employee which determines whether a particular test has been met or whether the exemption applies."

29 C.F.R. § 541.205 provides as follows:

"*Directly related to management policies or general business operations*. (a) The phrase 'directly related to management policies or general business operations of his employer or his employer's customers' describes those types of activities relating to the administrative operations of a business as distinguished from 'production' work. In addition to describing the types of activities, the phrase limits the exemption to persons who perform work of substantial importance to the management or operation of the business of his employer or his employer's customers.

"(b) The administrative operations of the business include the work performed by so-called white-collar employees engaged in 'servicing' a business as, for example, * * * planning, * * * representing the company, * * * and business * * * control. * * *

* * * * * *

"(c) As used to describe work of substantial importance to the management or operation of the business, the phrase 'directly related to management policies or general business operations' is not limited to persons who participate in the formulation of management policies or in the operation of the business as a whole. Employees whose work is 'directly related' to management policies or to general business operations include those whose work affects policy or whose responsibility it is to execute or carry it out. The phrase also includes a wide variety of persons who either carry out major assignments in conducting the operations of the business, or whose work affects business operations to a substantial degree, even though their assignments or tasks relate to the operation of a particular segment of the business."

It is clear that the dispatchers "carry out major assignments in conducting the operation of the business" and that "their work affects business operations to a substantial degree." "Primary duty," as used in 29 C.F.R. § 541.2, is defined in §§ 541.206 and 541.103 to mean "in the ordinary case" that the major part or over 50% of the employee's time is spent in the performance of the work directly related to management policies or general business operations of his employer. However, § 541.103 goes on to state:

"Time alone, however, is not the sole test, and in situations where the

employee does not spend over 50 percent of his time in managerial duties, he might nevertheless have management as his primary duty if the other pertinent factors support such a conclusion. Some of these pertinent factors are the relative importance of the managerial duties as compared with other types of duties, the frequency with which the employee exercises discretionary powers, his relative freedom from supervision, and the relationship between his salary and the wages paid other employees for the kind of non-exempt work performed by the supervisor."

29 C.F.R. § 541.207(a) provides:

"In general, the exercise of discretion and independent judgment involves the comparison and evaluation of possible courses of conduct and acting or making a decision after the various possibilities have been considered. The term as used in the regulations in Subpart A of this part, moreover, implies that the person has the authority or power to make an independent choice, free from immediate direction or supervision and with respect to matters of significance."

Sub-paragraphs (d) and (e) of that section provide in part:

"* * * the discretion and independent judgment exercised must be real and substantial, that is, they must be exercised with respect to matters of consequence. * * *

* * * * * *

"The term 'discretion and independent judgment' as used in the regulations in Subpart A of this part does not necessarily imply that

the decisions made by the employee must have a finality that goes with unlimited authority and a complete absence of review. The decisions made as a result of the exercise of discretion and independent judgment may consist of recommendations for action rather than the taking of action. The fact that an employee's decision may be subject to review and that upon occasion the decisions are revised or reversed after review does not mean that the employee is not exercising discretion and independent judgment within the meaning of the regulations in Subpart A of this part."

■ It is clear that the dispatchers have authority and power to make an independent choice, free from immediate direction or supervision and with respect to matters of significance and consequence. It is clear that they can not only recommend the employment and discharge of the drivers and platform workers but they actually do send the drivers and platform workers home on occasion, directing them to report to the Terminal Manager before coming back to work. Also, they hire drivers frequently. The above language makes clear that the fact that the dispatcher's decisions can be reversed by either the Terminal Manager or the Regional Manager does not prevent them from exercising "discretion and independent judgment," as those terms are used in 29 C.F.R. § 541.2.

29 C.F.R. § 541.208 uses the following language in sub-sections (a) and (e):[7]

"(a) As indicated in section 541.-202 above, work which is directly and closely related to the performance of the work described in the regulations is considered exempt

---

**7.** Defendant, at the trial (N.T. 206) and at page 9 of its brief, objected to the consideration by the trial judge of a Report and Recommendations on the Proposed Revision of 29 C.F.R. § 514 which was sent to the Administrator, referred to in § 13 of the Act, in July 1949 (Exhibit P-18). The regulations now appearing in 29 C.F.R. § 514 were adopted by the Administrator in December 1949.

The trial judge rules that he is entitled to take judicial notice of the contents of P-18 in applying the regulations to this case and has considered P-13 (including page 57) in deciding this case. The relative weight to be given to such a report will vary according to the clarity of the regulations on the point and to the part of the report relied on. See Supplemental Memorandum.

work. Some illustrations may be helpful in clarifying the differences between such work and work which is unrelated or only remotely related to the work described in the regulations.

\* \* \* \* \* \*

"(e) The following additional examples may also be of value in applying these principles. A traffic manager is employed to handle the company's transportation problems. The exempt work performed by such an employee would include planning the most economical and quickest routes for shipping merchandise to and from the plant, contracting for common-carrier and other transportation facilities, negotiating with carriers for adjustments for damages to merchandise in transit and making the necessary rearrangements resulting from delays, damages, or irregularities in transit. This employee may also spend part of his time taking 'city orders' (for local deliveries) over the telephone. The order-taking is a routine function not 'directly and closely related' to the exempt work and must be considered nonexempt."

Although plaintiff emphasizes the last sentence of the above regulations, the record makes clear that the bulk of the dispatcher's telephone work is giving instructions to the drivers as part of "planning the most economical and quickest routes" (see third sentence of (e) above) and relatively little of the telephone time is involved in taking orders for transportation.

Under these sections, the trial judge concludes that the dispatcher's primary duty consisted of the performance of office or non-manual field work directly related to management policies or general business operations of his employer.

It is noted that the proviso contained in 29 C.F.R. § 541.2 and further explained in 29 C.F.R. 541.214 does not require that the employee "customarily and regularly" perform the work described, even though these words are used to describe other exempt work in the regulations.

The cases [8] involving facts most similar to those established by this record are McComb v. New York & New Brunswick Auto Exp. Co., D.C.D.N.J.1950, 95 F. Supp. 636, 640–642, and Mitchell v. Baggett Transportation Co., 12 W.H.Cases 369 (W.D.Ala.1954).[9] In both these cases, dispatchers similar to those involved in this case were found to be exempt under 29 U.S.C.A. § 213 and the regulations issued under that section.

In the McComb case, supra, Chief Judge Forman said at pages 641–642:

"All three of these employees have been engaged with the defendant for long years and have come up through the various laboring ranks to their positions. They were the controllers of the heart mechanism of the business of the defendant. Their responsibilities went to the defendant, its customers and the other employees. Together they form the round-the-clock team that administers the actual commodity that it sells, namely, the collection and delivery of merchandise.

\* \* \* \* \* \*

"As gleaned from the testimony given to the court on examination and cross examination, the work performed by these employees fitted into the above terms (regulations) as though it were machine-tooled for the purpose. They performed non-manual field work directly related to the general business operations of their employer or their employer's customers; \* \* \* and two of

---

8. The following very helpful and able briefs filed by counsel are being placed in the Clerk's file so that an appellate court may have the benefit of the many cases disclosed by the research of counsel: Plaintiff's brief, defendant's brief, and plaintiff's reply brief.

9. In the Baggett case, the dispatcher's job was very similar to that of those involved in this case. See Finding of Fact 7 at 12 W.H.Cases 371.

them receive a salary of more than $100 per week, and in such cases their primary duty consisted of the performance of office or non-manual field work directly related to general business operations of their employer or their employer's customers, which includes work requiring the exercise of discretion and independent judgment. These employees, Messrs. Dodds, Steiner and Lowen, are justifiably regarded by the defendant as exempt under § 13(a) (1) of the Fair Labor Standards Act." Cases such as Rothman v. Publicker Industries, 3 Cir., 1953, 201 F.2d 618,[10] relied on by plaintiff are quite distinguishable from the facts of this case.

## II. Clerical Workers

As of April 1, 1958, defendant conceded that two of its clerical employees at its Reading terminal were covered by § 7 of the Act (29 U.S.C.A. § 207) and were entitled to overtime pay. One employee was paid $304.87 for overtime work during the period from September 15, 1955, to April 1, 1958,[11] and the other was paid $26.67 for overtime work during the period from August 1953 to September 1954.[12]

The current investigation of defendant's Reading terminal, on the basis of which this action was investigated, began August 1953 and this suit was started January 31, 1957, but these payments were not made to these employees until April 1958. Furthermore, a national investigation of defendant's business had been made in 1942 and resulted in the payment of overtime violations of

$1,323.72 due to 47 employees, some of whom were clerks. Plaintiff's Request for Finding of Fact 3(1) (adopted above) also states:

"There was a bona fide dispute as to coverage. Violations were not considered to be of a wilful character. The investigation was closed administratively after payment of back wages and *agreement to future compliance.*" (Emphasis supplied.)

Similarly, a 1944 investigation of the Baltimore terminal of defendant resulted in the payment of $1,103.71 of overtime wages to four employees, after settlement of a bona fide claim of non-coverage and there was an "agreement to future compliance" (N.T. 213).

■ There is no evidence that the failure to pay overtime to the above two clerks resulted from a bona fide dispute and at least one of the clerks was required to wait over four years for some of the overtime pay to which Congress had stated she is entitled. As stated in Tobin v. Anthony-Williams Mfg. Co., 8 Cir., 1952, 196 F.2d 547, 551, " * * * it may be noted again that no testimony was adduced * * * as to any steps taken, or to be taken, to insure future compliance."

■ The record makes clear that there has been a violation of § 15 of the Act (29 U.S.C.A. § 215) and that plaintiff is entitled under § 17 (29 U.S.C.A. § 217) to an injunction to restrain violations of that section. The good faith of an employer does not prevent the issuance of an injunction under the above-

---

10. Rothman apparently could not qualify under the proviso of 29 C.F.R. § 541.2 involved in this case and the appellate court concluded that he did not " 'customarily and regularly [exercise] discretionary powers'" (201 F.2d at page 619). As pointed out above, the language "customarily and regularly" does not apply to the proviso. Furthermore, Rothman was a "Yard Master" of a shipper whose "principal function was to receive instructions from various departments of the plant that particular cars should be moved to or from some load-

ing or unloading point and to transmit these instructions to the appropriate railway operating crew" (201 F.2d at pages 619–620). He had no supervisory control over the railway employees, whereas the dispatchers supervised the drivers and platform men in this case.

11. See plaintiff's Requests for Findings of Fact 6 and 8, which are adopted by the trial judge.

12. See plaintiff's Requests for Findings of Fact 7 and 8, which are adopted by the trial judge.

mentioned § 17. See Chambers Construction Company v. Mitchell, 8 Cir., 1956, 233 F.2d 717, 725; McComb v. Homeworkers Handicraft Cooperative, 4 Cir., 1949, 176 F.2d 633, 640–641, certiorari denied 1949, 338 U.S. 900, 70 S.Ct. 250, 94 L.Ed. 553; cf. McComb v. Dobson, D.C.W.D.Pa.1948, 77 F.Supp. 1, 4.

### Conclusions of Law

1. This court has jurisdiction over the subject matter and over the parties.

2. The following requests for Conclusions of Law of the plaintiff are adopted, with the modifications indicated, as Conclusions of Law of the trial judge: 1; 2; 3, with "Requests for" inserted at the beginning of the last line; 4; 6; 8–12; 30; 31; and 33, with the words "within two months" substituted for the words "on the second day" in that paragraph.[13]

3. Paragraphs 1 to 5 of the request for Conclusions of Law of the defendant are adopted as Conclusions of Law of the trial judge.[14]

4. The dispatchers (Bausher and Frederick) are exempt from the overtime provisions of the Act under § 13 (29 U.S.C.A. § 213) and the regulations issued under that section.

5. Under § 17 of the Act (29 U.S.C.A. § 217), the plaintiff is entitled to an injunction restraining defendant from violations of § 15(a) (2) and (5) of the Act (29 U.S.C.A. § 215) as to the employees at the defendant's Reading, Pennsylvania, terminal.[15]

13. Paragraphs 5, 7, 15, 22, 23, 26, 29 and 34 are denied. It is unnecessary to pass on the validity of the statements contained in paragraphs 13, 14, 16–21, 24, 25, 27, 28 and 32 because they are inapplicable to the conclusion that the dispatchers are "employed in a bona fide * * * administrative * * * capacity" within the terms of § 13 (29 U.S.C.A. § 213) of the Act and the regulations issued thereunder. Paragraph 25 is inapplicable because it states that the dispatchers "do not hire * * * except infrequently in emergency situations," and the dispatchers frequently

have to hire employees each week when business is good, whereas 29 C.F.R. § 541.109 makes clear that emergency work is work which cannot be anticipated. Also, paragraph 28 is inapplicable because it applies to findings under the lengthy tests included in said 29 C.F.R. § 541.2, as well as the shorter tests included in the proviso, whereas the conclusions of the trial judge are based solely on the wording of the proviso.

14. Paragraphs 6 and 7 are denied.

15. With reference to record-keeping violations, see letter of November 24, 1958.