Lenzy **PERINE**, Plaintiff,

v.

**ABF FREIGHT SYSTEMS, INC., and DOES 1–10, inclusive, Defendants.**

No. CV06–1770 SVWSWX.

United States District Court, C.D. California.

Sept. 20, 2006.

ABF Freight Systems, Inc. ("Defendant" or "ABF"), on February 16, 2005. At the time of his termination, Plaintiff was employed as a dispatcher by Defendant, although he had held numerous positions with the company for approximately a decade. The principal issue in dispute is whether Plaintiff should have been classified as an exempt or non-exempt employee under California law.

Plaintiff claims that he was never paid overtime while employed as a dispatcher, from February 2002 through February 2005, despite the fact that he frequently worked hours in excess of his shift. Plaintiff asserts that he is owed unpaid wages in the amount of $66,030. Plaintiff also seeks interest on his overtime compensation, an award of civil penalties under state law, reasonable attorney's fees, and costs.

This case was originally filed in Los Angeles Superior Court on February 22, 2006. Defendant removed the action to this Court. The lawsuit was filed under California Labor Code § 1198. Thus, this Court has jurisdiction solely under 28 U.S.C. § 1332.

Plaintiff has filed a motion for partial summary judgment, asking this Court to hold that Plaintiff was a non-exempt employee as a matter of law. Defendant has also filed a motion for summary judgment, on the question of "whether Plaintiff was properly classified as administratively exempt from overtime." (Def. Motion at 1.)

For the reasons discussed below, this Court GRANTS Defendant's motion for summary judgment. Additionally, this Court DENIES Plaintiff's motion for partial summary judgment.

Robin D. Perry, Robin D. Perry Law Offices, Long Beach, CA, for Plaintiff.

David T. Van Pelt, Lorraine H. O'Hara, Michael L. Gallion, Seyfarth Shaw, Los Angeles, CA, for for Defendants.

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; ORDER DENYING PLAINTIFF'S PARTIAL MOTION FOR SUMMARY JUDGMENT [11, 16]

WILSON, District Judge.

## I. INTRODUCTION

Plaintiff Lenzy Perine ("Plaintiff" or "Perine") was terminated by Defendant

## II. FACTS

The evidence in this case is largely limited to the depositions (and attached docu-

ments) of two individuals: (1) Plaintiff, and (2) Jonathan Steven Mayweather.[1] Mayweather was promoted to the position of operations manager at the Long Beach ABF facility in May 2004, and was Plaintiff's supervisor from that date until Plaintiff's discharge in February 2005. (Mayweather Depo. at 5:18–24.) In order to most clearly analyze the evidence provided by both sides, this Court believes it is proper to summarize these two depositions consecutively.

### A. Plaintiff's Deposition

#### 1. The Start of Plaintiff's Employment with ABF

Prior to joining ABF, Plaintiff had ten years of experience in the freight business working with Roadway Express. (41:15–18.) At his hiring, ABF never provided him with a job description, and Plaintiff never received any formal training because of his industry background. (41:10–15.) Plaintiff learned ABF's particular system through his own observations and self-teaching. (42:17–20.) During his many years with ABF, Plaintiff kept no documentation related to the number of hours he worked, or the days he was actually present at work. (43:4–7.)

Plaintiff was first hired as an inbound supervisor in April 1995. (64:19–25.) He worked in that capacity for six to eight months. (65:7–10.) He then worked as the outbound supervisor for approximately one and one-half years. (66:12–15.) His position changed again at that point, and he became a dispatcher[2] for the first time—

until early 1998. (68:2–5.) He was paid the same salary for all of these positions, (68:6–8), and Plaintiff asserts that the three positions are equally important (55:16–18.). At that point he was promoted and became Long Beach's operations manager. (71:12–16.)

However, in August 1999 Plaintiff was demoted (71:19–25; 72:1–25). He became the outbound supervisor again for one month. (73:12–21.) Plaintiff felt mistreated and left ABF to work with another company in mid-September 1999. (74:19–22.)

He was employed with Air Eagle as a dispatcher for two months (76:5–12), until he voluntary resigned to return to ABF (78:5–8.) as the outbound supervisor (86:17–19). Plaintiff worked at ABF's facility in Pico, instead of Long Beach. (89:23–25.) Within a few months, he took a "line haul position." (91:18–25.)

However, in February 2002, he was transferred to Long Beach and became the dispatcher there once again. (92:11–13.) He remained in that position continuously until February 2005 (100:1–5.) This was not a unionized position. (102:24–15, 103:1.) On a daily basis, he monitored the movement of freight that was worth at least hundreds of thousands of dollars (112:17–20.)

He earned between $4,400 and $4,700 a month during this period (206:3–6, 19–23, 207:6–11.), but was never paid overtime (228:17–20).

---

1. Plaintiff has also submitted two additional declarations:
   (1) Theresita Bonifacio's, a customer service clerk with ABF, and
   (2) Frank McKeag's, a driver for ABF. Defendant seeks a ruling on its evidentiary objections to these declarations. However, because the relevant information is repetitive of information otherwise found in the deposi-

tions of Plaintiff and Mayweather, this Court has no basis for relying them. Consequently, there is no need for this Court to rule on these evidentiary objections.

2. In the record, the term "operations supervisor" is sometimes used as an equivalent term for dispatcher. (73:21–25.)

### 2. Plaintiff's Duties as a Dispatcher

From February 2002 through February 2005, Plaintiff supervised 20 to 30 employees (on average) a day. (52:21–24.) There were three types of drivers, which were categorized in accordance with union bidding: (1) those with routes, (2) shag drivers, and (3) "20 percenter[s]". (108:8–25, 109:1–6.) Once these drivers were on the road, Plaintiff was limited to "giv[ing] them their pickups and let[ting] them know where they need[ed] to go." (107:18–20.)

When Plaintiff arrived at work in the morning, he would first determine what trucks were available for use that day. (114:22–25.) The freight was loaded onto the trucks before his shift. (115:12–16.) Drivers were assigned to the trucks based on their seniority (117:8–12), and Plaintiff was responsible for ensuring that seniority was respected (121:13–16.) If a preassigned truck was not available, Plaintiff would then decide which available truck the affected driver used. (118:12–14.) This situation occurred once or twice a week on average. (119:1–4.)

The "20 percenters" filled in whenever there was an excess of freight, or when route and shag drivers were absent, which was essentially a daily occurrence. (125:4–23.) It was generally Plaintiff's responsibility to contact these individuals for replacement duty based on their seniority. (123:16–20.) Once everyone was present, Plaintiff also ensured that the shipments left the Long Beach facility at the appropriate appointment time. (129:8–12.)

After finishing his rounds in the yard, Plaintiff would return to his computer screen. (130:15–20.) When customers called for "pickups," Plaintiff would often take their orders. (131:1–8.) He would then enter the essential shipping information into the computer. (131:13–20.) During his shift, he also handled customer complaints (140:1–9), and drivers called him when a customer refused delivery of a shipment (140:12–17.)

Additionally, Plaintiff was responsible for monitoring the number of hours that his drivers were on the road, as they could not work beyond fourteen hours per shift. (147:14–17, 148:10–19.) He also kept track of the drivers' overtime hours. (148:20–24.) He was expected to schedule pickups in a manner that would minimize the payment of overtime. (149:4–9.) He also was required to understand procedures related to union regulations and the Collective Bargaining Agreement. (153:10–19.)

Plaintiff tracked the performance of his drivers to ensure that they delivered their freight in a timely manner. (155:4–9.) If a driver acted improperly, the operations manager would tell Plaintiff to issue a warning letter to the offending individual. (158:23–25, 159:1–17.) Plaintiff would also sometimes interact with personnel to determine the appropriate level of discipline for the driver, which was based on the Collective Bargaining Agreement. (160:16–25.) To some extent, Plaintiff was also expected to monitor any excessive absenteeism or tardiness. (177:11–19.) If someone was not "performing to par," then Plaintiff might also issue an "employee discussion report." (242:2–5.) The operations manager instructed Plaintiff to prepare these reports. (242:22–25, 243:1–5.)

The drivers also called Plaintiff whenever they were involved in car accidents, and it was Plaintiff's responsibility to relay that information to the safety enforcement division. (162:23–25.) Plaintiff entered this information into ABF's computer system. (163:1–5.) When the driver returned, Plaintiff would meet with the driver in order to understand the accident in greater detail. (163:15–17.) He also checked to make sure that the driver filled out the

accident report appropriately. (164:8–13.) The safety manager would then decide how to discipline the driver, and that information was relayed via Plaintiff. (165:20–21, 170:9–14.)

Plaintiff further ensured that ABF's trucks were serviced on time. (53:14–15.) He was provided with a daily report that detailed the schedule for servicing (53:22–25.) Based on this report, Plaintiff would post the relevant information on a chalkboard for other employees to see. (54:6–8.) At times, Plaintiff made the decision to send these trucks for maintenance without approval from his supervisors.

In his position, Plaintiff was never involved in the manual labor of moving freight. (111:18–21.) Plaintiff also had no responsibility for deciding which trucks would carry which loads of freight, as that was determined by the inbound supervisor. (113:22–25.) He also had no authority to hire or fire drivers, (154:10–12.) although he was occasionally asked for his opinion (154:16–17.) Theoretically, Plaintiff was empowered to recommend discipline of drivers for having a negative demeanor, but this situation never arose. (172:1–14.) The driving routes were determined before Plaintiff's shift began. (179:4–8.) Plaintiff also never held meetings with his drivers prior to their leaving for the day. (204:3–17.)

### 3. Plaintiff's Duties for the "Majority" of His Work Day

When calls for "pickups" came in, the computer would indicate its pertinent geographical region. (133:2–5.) Plaintiff would then have to decide which driver would go to the location to pickup the freight. This was solely his responsibility, even if a different employee answered a

customer's call and entered the customer's order into the computer. (139:18–22.)

For example, if the freight was "small enough for the route driver to pick it up, it would be assigned to the route driver." (133:14–15.) If it was larger, then Plaintiff assigned it to a shag driver, (133:15–17.) based upon which shag driver was in the closest proximity to the pickup (134:22–24.) In reaching his decision, Plaintiff also considered each driver's progress in terms of their scheduled deliveries. (135:10–12.) Further, the amount of room a driver had in his/her truck was relevant. (135:23–24.) Finally, the size of the truck was also pertinent to Plaintiff's analysis. (136:8–12.) It is also clear that Plaintiff had to consider how many hours a driver had been on the road, as well as the general goal of minimizing overtime pay.

Plaintiff concedes that this activity is what he did for a "majority" of his work day. (136:19–25.) Because the drivers were on the road by this point, seniority was no longer relevant to Plaintiff's assignments. (137:6–9.)

### 4. Plaintiff's Termination

Plaintiff asserts that another supervisor, Carlos Zavala, had given notice to leave ABF because he wanted to work a different shift. Plaintiff implies that in order to meet Zavala's demands for a day position, Plaintiff's supervisors gave Plaintiff the worst performance review of his career. (48:1–6, 17–22.) This review served as a pretext to terminate Plaintiff, leading ABF to replace him with Zavala. (48:7–9.) Plaintiff has since obtained employment as a dispatcher with Conway Western Express (17:22–25)—a position that also does not pay him overtime (25:1.) [3]

---

**3.** Plaintiff does, however, receive "comp days" when he works longer than his stated shift. (24:1–14.)

### B. Mayweather's Deposition

#### 1. Scope of Knowledge

Mayweather did not arrive at ABF's Long Beach facility until May 2004, when he was promoted to operations manager. (5:13–21.) Consequently, his testimony provides no information to this Court regarding Plaintiff's employment with ABF from February 2002 through May 2004. According to Mayweather, the dispatcher position has no written job description. (9:12–15.)

#### 2. Plaintiff's Duties

Mayweather states that the dispatcher is "responsible for administering all city drivers, city deliveries and pickups." (73:7–9.) When Plaintiff arrived, he would hand out the preassigned routes to the drivers. (79:15–18.) The dispatcher was also expected to arrive one hour before the shift began at 8:30 a.m. to discuss any potential issues with the inbound supervisor. (82:22–25.) Further, dispatchers were required to hold weekly meetings with their drivers for five to ten minutes before they left on their routes. (107:10–19.)

The route driver assignments were predetermined by union bidding. (59:8–14.) The dispatcher decided the order in which shag trucks were scheduled to leave for delivery, but the shag drivers chose which jobs they preferred based on seniority. (60:12–25.) Once the drivers were in the field, Plaintiff had the authority to offer overtime to drivers if necessary. (67:21–25, 68:1–14.) He also decided how many "20 percenters" were required, based upon that day's freight load and the number of other regular drivers present. (69:16–25.) However, the "20 percenters" had to be given their initial driving assignments by seniority. (71:19–23.)

Once the drivers left, the dispatcher went to his computer and viewed the mobile dispatch screen. (84:3–6.) During the day, "[he] would assign all the pickups based on trailer space, [and] based on the number of pickups to the city drivers, to the shag drivers, [and] coordinate and . . . monitor . . . when the[ drivers] were coming back [to Long Beach]." (84:8–12.) When deciding on the assignment of a given pickup, Plaintiff was expected to follow ABF's policy of analyzing the pickup's location and the space each driver had on their truck. (86:17–25, 87:1.) There were 80 to 100 pickups a day, on average, to coordinate. (87:7–12.) Union rules were irrelevant to these assignments. (87:2–7.) The dispatcher made these decisions on his computer, which was communicated electronically to the impacted driver. (88:–10–22.) Plaintiff also had the discretion to have drivers come in early if necessary to timely secure all pickups and deliveries. (91:14–25, 92:23–25.) ABF had "broad programs to facilitate pickups and deliveries," and Plaintiff was expected to coordinate these activities under these generalized guidelines. (128:9–16.) The dispatcher has no role in designing this overarching system, but he has significant autonomy within it. (129:11–25.)

Plaintiff monitored driver hours, as they were limited to a daily maximum that was regulated by the Department of Transportation. (108:2–12.) This responsibility, though, was shared by everyone in the terminal. (109:7–11.) The computer warns the dispatcher when a particular driver is approaching his/her daily hourly limit. (109:24–25, 110:1–3.)

Plaintiff also acted as a customer service agent while on shift. This meant that he interacted with customers who had complaints and questions. (94:6–16.) He was responsible for monitoring driver progress throughout the day. (95:–7–10.) While he had no ability to hire, fire, or suspend

drivers, he could "start the process." (95:11–21.) This meant writing an employee discussion report, which was done to make the driver aware of the problem. (97:14–20.) However, Plaintiff never wrote an employee discussion report while Mayweather was his supervisor. (99:20–22.)

The dispatcher spends ten to fifteen percent of his day answering phone calls. (23:18–23.) Plaintiff would sometimes tell the operations manager that certain items needed to be ordered, which Plaintiff did upon receiving authorization. (66:5–17.)

Plaintiff was additionally responsible for maintaining the shipping equipment. (100:23–25.) He was also expected to ensure that enough equipment and personnel were present for shipping freight each day. (101:10–12.) The dispatcher was further required to return borrowed items within five days, in order to avoid a surcharge. (104:18–24.)

## III. DISCUSSION

### A. Legal Standard Governing a Motion for Summary Judgment

Rule 56(c) requires summary judgment for the moving party when the evidence, viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. See Fed.R.Civ.P. 56(c); *Tarin v. County of Los Angeles,* 123 F.3d 1259, 1263 (9th Cir.1997).

The moving party bears the initial burden of establishing the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). That burden may be met by " 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." Id. at 325,

106 S.Ct. 2548. Once the moving party has met its initial burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and identify specific facts that show a genuine issue for trial. *See id.* at 323–34, 106 S.Ct. 2548; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "A scintilla of evidence or evidence that is merely colorable or not significantly probative does not present a genuine issue of material fact." *Addisu v. Fred Meyer,* 198 F.3d 1130, 1134 (9th Cir.2000). Only genuine disputes—where the evidence is such that a reasonable jury could return a verdict for the nonmoving party—over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. *See Anderson,* 477 U.S. at 248, 106 S.Ct. 2505; *see also Arpin v. Santa Clara Valley Transp. Agency,* 261 F.3d 912, 919 (9th Cir.2001) (the nonmoving party must present specific evidence from which a reasonable jury could return a verdict in its favor).

Where the moving party bears the burden of proof at trial, that party must present evidence, which if uncontroverted, would entitle it to prevail. *UA Local 343 v. Nor–Cal Plumbing, Inc.,* 48 F.3d 1465, 1471 (9th Cir.1994). Once such a moving party has established a prima facie case, the non-moving party must produce evidence to contradict it in order to survive summary judgment.

### B. Elements for Establishing the Administrative Exemption

Transportation workers in California are governed by rules issued by the Industrial Welfare Commission. ABF argues that Plaintiff is exempt from overtime wages because he is a qualifying administrative employee. Under Wage Order 9–2001, an employee is considered adminis-

tratively exempt[4] if he/she meets all of the following five requirements:

(1) "[P]erformance of non-manual work directly related to management policies or general business operations of his employer or his/her employer's customers."

(2) "[C]ustomarily and regularly exercises discretion and independent judgment."

(3) Who performs "special assignments and tasks" or "work[s] along specialized or technical lines requiring special training, experience, or knowledge," under only "general supervision."

(4) "Who is primarily engaged in duties that meet the test of the exemption."

(5) "[E]arn[s] a monthly salary equivalent to no less than two (2) times the state minimum wage full-time employment."

Wage Order 9–2001(1)(a)(2). While this case arises under California law, this Court is explicitly permitted to refer to federal authorities for analytical support in interpreting Wage Order 9–2001. *See Nordquist v. McGraw–Hill Broad. Co.*, 32 Cal.App.4th 555, 562, 38 Cal.Rptr.2d 221 (1995) ("Because the California wage and hour laws are modeled to some extent on federal law, federal cases may provide persuasive guidance.").

■ It is worth noting that it is the employer who "bears the burden of proving an employee is exempt." *Id.* (citing *Corning Glass Works v. Brennan*, 417 U.S. 188, 196–97, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974)). Additionally, ABF has tried to argue that the administrative exemption's analysis under California law is indistinguishable from its federal law counterpart. However, this argument is not wholly accurate. *See id.* (noting that California's "administrative employee exemption is somewhat different" from that under federal law).

## C. Determining Whether Plaintiff was an Exempt Administrative Employee

■ Two of the five above-described elements are clearly met, and thus they will be examined initially. First, it is undisputed that Plaintiff's monthly salary between February 2002 and February 2005 ranged from $4443 to $4696. This total, according to this Court's informal calculations, is at least three times the monthly salary of an individual earning California's applicable minimum wage rate of $6.75 per hour.[5]

Second, there can be little doubt that Plaintiff's work was "along specialized or technical lines requiring special training, experience, or knowledge." Wage Order 9–2001(1)(a)(2)(d). Plaintiff worked for Roadway Express for a decade prior to joining ABF, and then was employed in similar capacities with ABF for seven more years until he became a dispatcher for the second time in February 2002. As a dispatcher, Plaintiff was required to rely upon his years of experience and knowledge to make highly technical decisions on a daily basis—e.g., how to most efficiently coordinate pickups consistent with the need of certain drivers to follow preassigned routes. This knowledge accrued

---

4. Plaintiff also argued that he was not an exempt "executive" under this same Wage Order. However, Defendant explicitly disclaims any reliance on the executive exemption found at Wage Order 9–2001(1)(a)(1). (Def. Opp. at 5.)

5. California will soon be raising its minimum wage to $7.50 per hour in January 2007, and then $8 per hour in January 2008. *See* Marc Lifsher & Alana Semuels, *State Minimum Wage Gets a Raise*, L.A. Times, Sept. 13, 2006. However, $6.75 was the applicable minimum wage rate while Plaintiff was a dispatcher.

from his years of experience in the industry, and is clearly specialized.

■ In terms of the other three elements, Defendant points to the fact that Plaintiff's résumé describes his position with ABF as a "City Dispatch Supervisor." (Perine Depo. Ex. 8.) However, whether an employee is exempt or non-exempt is an issue of fact, and the employee's job title is unimportant. *See Nordquist,* 32 Cal. App.4th at 564, 38 Cal.Rptr.2d 221 ("[W]hether an employee is exempt is a factual question, so prior decisions are of limited value because employees with the same job titles may be either exempt or nonexempt depending on their job functions.").

Defendant further asserts that established federal case law unquestionably leads to the conclusion that a "dispatcher" is exempt as a matter of law. However, the advice of another federal court on this claim is instructive:

> Reference to cases wherein unpaid wages for "dispatchers" was sought is helpful only if the tasks and duties of those "dispatchers" are substantially identical to the tasks and duties of the defendant's dispatchers. For the Regulations do not exempt those who qualify as "dispatchers"; they only exempt those employees who do certain defined tasks.

*Marshall v. Nat'l Freight,* 1979 WL 1977, at *5 (D.N.J. Sept.6, 1979). This Court further notes that the scope of exempt employment is a highly unsettled area of California employment law. As one treatise has written:

> The question of who is "exempt" (no overtime earned) and who is "non-exempt" (overtime earned) is one of the

least understood areas in employment law, largely because the rules no longer reflect the realities of the modern workplace. . . . The basic concepts date back to the turn of the century when it was clear that a factory worker earned overtime and the "boss" did not. In the modern, mostly white-collar, workplace, these rules do not always make sense. . . . Errors are common in rating employees as exempt when they in fact qualify as non-exempt employees. For example, administrative assistants, computer programmers, accountants, and senior technicians are routinely rated as exempt when they should in fact be earning overtime.

California Civil Practice: Employment Litigation, § 4.3 (2006). Thus, this Court must examine the remaining elements of the administrative employee exemption with a careful eye to the facts of this case.

### 1. Plaintiff's Primary Duties Must Meet the Test for Exemption

In order to be exempt under the administrative exemption, Plaintiff must be "primarily" engaged in duties that qualify under this section. The term " 'primarily' means more than one-half of the employee's worktime." Cal. Labor Code § 515(e). Thus, "state regulation takes a purely quantitative approach" to whether an employee is exempt or non-exempt. *Ramirez v. Yosemite Water Co.,* 20 Cal.4th 785, 794, 85 Cal.Rptr.2d 844, 978 P.2d 2 (1999).

Plaintiff testified that he spent the "majority" of his work day engaged in the duty of coordinating pickups while drivers were already on the road.[6] To determine whether this function is exempt, this Court must analyze the remaining elements below.

---

**6.** As a result, it is not necessary for this Court to examine Plaintiff's other duties, such as his limited involvement in disciplining drivers, customer service, or maintenance of equipment.

### 2. The Administrative/Producer Dichotomy

This element of the administrative employee exemption requires: "performance of non-manual work directly related to management policies or general business operations of his employer or his/her employer's customers." There is no question that Plaintiff's work is "non-manual." He was not permitted to ship ABF's freight physically, which is the drivers' responsibility. However, the more difficult and open question relates to whether Plaintiff's primary duty was "directly related to management policies or general business operations."

The California courts, as a means of guiding the interpretation of this provision, have found the "administrative/producer worker dichotomy" to be "useful." *Bell v. Farmers Ins. Exch.*, 87 Cal.App.4th 805, 820, 105 Cal.Rptr.2d 59 (2001). As such, it is necessary for this Court to distinguish between those employees whose duties "directly relate[ ] to management policies or general business operations of his employer or his employer's customers," and "production employees, who have been described as 'those whose primary duty is producing the commodity or commodities, whether goods or services, that the enterprise exists to produce.'" *Id.* at 820, 105 Cal.Rptr.2d 59 (quoting *Dalheim v. KDFW–TV*, 918 F.2d 1220, 1230 (5th Cir. 1990)).

Based on this dichotomy, it is clear that "administrative work refers to 'the running of a business,' as opposed to 'the day-to-day carrying out of its affairs.'" *Webster v. Pub. Sch. Employees*, 247 F.3d 910, 916 (9th Cir.2001) (quoting *Bratt v. County of Los Angeles*, 912 F.2d 1066, 1070 (9th Cir. 1990)). The administrative exemption, therefore, refers largely to activities that involve "'advising the management, planning, negotiating, [and] representing the company.'" *Palacio v. Progressive Ins. Co.*, 244 F.Supp.2d 1040, 1046–47 (C.D.Cal. 2002) (quoting 29 C.F.R. § 541.205(b)).

### a. Whether Plaintiff Should be Considered a "Production" Employee

Defendant argues that Plaintiff must be considered an exempt employee because he never physically shipped freight himself—in contrast to the union drivers. This Court is not convinced that Defendant's narrow vision of this rule is correct. *See Dalheim*, 918 F.2d at 1230 (noting that the "argument makes little sense" that non-exempt status is limited to "blue collar" employees); *see also Nordquist*, 32 Cal.App.4th at 562, 38 Cal.Rptr.2d 221 ("Exemptions are narrowly construed against the employer and their application is limited to those employees plainly and unmistakably within their terms.").

Defendant argues that *Palacio* supports its position, but the case is plainly distinguishable. In *Palacio*, insurance claims handlers were held exempt under the administrative exception partly because their employer was "not in the business of claims handling. Rather it [was] in the business of writing and selling automobile insurance." 244 F.Supp.2d at 1047. The task of resolving claims was obviously secondary to the primary business of writing insurance policies. In contrast, Plaintiff's primary duty of coordinating pickups appears to be intimately and directly related to the shipment of freight. Without Plaintiff's coordination, ABF's day-to-day business simply could not function. As opposed to insurance claims handling, this singular function does not necessarily require Plaintiff to advise management, negotiate, represent it, or otherwise make generalized plans on its behalf.

If one adopted Defendant's theory and extended it to the context of employment in television stations, then the only em-

ployees who would qualify as "producing" a news cast or television show would be the cameramen. However, in *Dalheim* (a case cited by the California Court of Appeals in *Bell*), the Fifth Circuit held that lower-level television producers were non-exempt employees. The Court identified the following functions performed by the producers:

> Producers are responsible for determining the content of the ten-to-twelve minute news portion of KDFW's thirty-minute newscast. They participate in meetings to decide which stories and story angles will be covered; they also decide the amount of time to be given a particular story, the sequence in which stories will be aired, and when to take commercial breaks. Producers have the authority to revise reporters' stories. All of the producers' actions are subject to approval by the executive producer.[7]

*Dalheim,* 918 F.2d at 1223–24. The Fifth Circuit held, under a clear error standard of review, that these activities did not meet the "directly related" threshold because the producers[8] were "not responsible for setting business policy, planning the long—or short-term objectives of the news department, promoting the newscast, [or] negotiating salary or benefits with other department personnel." *Id.* at 1231. Similarly, the simple coordination of pickups is comparable to that of the news producer described above. Plaintiff's primary duty empowers him to determine the sequence of deliveries and pickups, based on ever-changing facts—e.g., a driver's available space, and the size of the new customer's freight. This activity's relationship to "management policies" and "general busi-

ness operations" is tangential at best. Thus, it could be argued that the dispatcher's duty of coordinating pickups is related to ABF's day-to-day functions, rather than the "running" of the business. *See Bratt,* 912 F.2d at 1070.

### b. Plaintiff's Supervisory Functions are Infused into his Coordination of Pickups

This Court believes it is an open question whether California law would recognize the core dispatching function as exempt or non-exempt. However, Plaintiff's decisions regarding pickups were not limited to selecting the most efficient course of action. Rather, his decisions were bound up with his supervisory responsibilities. Every time a customer called for a pickup, Plaintiff's subsequent action had to reflect the company's policy of minimizing overtime pay and ensuring that driver would not be on the road beyond the ceiling imposed by the Department of Transportation. At best, Plaintiff's dispatching function was composed of a hybrid of exempt and non-exempt functions. California law has indicated though that the administrative/producer dichotomy is only applicable where Plaintiff's activity "squarely falls on the production side of the line." *Palacio,* 244 F.Supp.2d at 1046 (quoting *Bothell v. Phase Metrics, Inc.,* 299 F.3d 1120, 1124–25 (9th Cir.2002)).

To make its argument, Defendant relies on several federal cases where "dispatchers" were held exempt. However, Defendant's citation to *LaPoint v. CRST Int'l, Inc.,* 2004 WL 3105950 (N.D.Iowa 2004), is inappropriate—a case involving an individ-

---

7. While it is true that these producers were arguably under greater supervision than Plaintiff in this case, the issue of supervision is unrelated to whether an employee's work is "directly related" to "management policies" or "general business operations."

8. The *Dalheim* Court also held that the station directors, assignment reporters, and editors were all nonexempt employees. *Id.* at 1228.

ual who was a "fleet manager/dispatcher." The *LaPoint* plaintiff admitted that he was one of two or three individuals who "kept things running until the next day shift came in." *Id.* at *9. This concession, especially in light of the defendant's claims that the plaintiff acted in a capacity similar to that of a manager, was sufficient to grant summary judgment for defendant. Mayweather's position as operations manager is more commensurate with these conceded duties than Plaintiff.

Defendant also cites to *Freeman v. Corporate Express Delivery Systems*, 1999 WL 1012331 (N.D.Cal.1999), for additional support. However, the individual in that case was not simply a dispatcher, but someone who *supervised* dispatchers. This position again appears comparable to Mayweather's job as operations manager, and thus was not a position that directly "produced" the company's services.[9]

Finally, Defendant places substantial weight upon a case where it was previously a defendant—*Goldberg v. Arkansas Best Freight Sys., Inc.*, 206 F.Supp. 828 (W.D.Ark.1962)—which involved a lawsuit brought by the Secretary of Labor for alleged violations of the federal Fair Labor Standards Act. Two of the individuals represented were dispatchers for Arkansas Best Freight, ABF's predecessor in title, and were described as having the following duties:

> They assign drivers to particular areas of the city, prescribe the routes for the driver to follow in making pick-ups or deliveries of shipments. They regulate

his [sic] work in such a way as to obtain the most economical operation and maximum production from each driver. The determination of the type of equipment to be sent is made entirely by the exercise of the judgment of the dispatcher.... The dispatcher's recommendation as to employment and discharge of drivers and their discipline is given weight by the management.

*Id.* at 833. This case is not wholly persuasive for two reasons. First, the court did not engage in an analysis of what activities constituted a "majority" of the dispatchers' time, as is required under California law. As a result, it is certainly possible that the dispatchers' duties related to equipment and hiring/firing of drivers constituted the employees' primary activities—and not the process of directing drivers from pickup to pickup. Second, and perhaps more importantly, this case was written before the advent of the administrative/producer dichotomy, which the California courts have found useful in their analysis.[10]

Nonetheless, this Court finds *Goldberg* persuasive in its final analysis because it is most factually analogous to Plaintiff's majority duties. As quoted above, the *Goldberg* dispatchers had management-like duties, such as the ability to hire and fire drivers and to decide what equipment should be used. Plaintiff's core function of assigning drivers to pickups likewise requires him to act in a supervisory capacity because he must consider whether to permit overtime pay and must conform his assignments to the Department of Transportation guidelines. These actions re-

---

**9.** Defendant also cites to additional case law to argue that Plaintiff's other duties are administrative in nature. However, because those activities do not amount to the majority of Plaintiff's work, they are inapposite.

**10.** Similar limitations are evident in *Donovan v. Flowers Marine, Inc.*, 545 F.Supp. 991 (E.D.La.1982), in which the dispatchers were

also responsible for negotiating on the company's behalf and acting as its representative. *Id.* at 993. The same is also true of *McComb v. New York & New Brunswick Auto Express Co.*, 95 F.Supp. 636 (D.N.J.1950), and *Mitchell v. Branch Motor Express Co.*, 168 F.Supp. 72 (E.D.Pa.1958).

quire Plaintiff to "plan" in a manner that directly impacts ABF's "general business operations." Because these considerations are present with Plaintiff throughout the majority of his work day, he must be considered as engaged in duties that are "directly related" to "management policies" or "general business operations."

### 3. Plaintiff's Exercise of Discretion and Independent Judgment

The last element to be examined requires that a Plaintiff's duties involve: (1) substantial discretion as to, (2) matters of importance. *See Nordquist*, 32 Cal. App.4th at 572–74, 38 Cal.Rptr.2d 221. Plaintiff's coordination of pickups involves both of these factors. When Plaintiff received notice that a new pickup had been entered into ABF's computer system, his analysis required the consideration of several factors. Importantly, he was never provided any manual as to specific standards and procedures for deciding which driver should attend to a given pickup. These decisions were not immediately supervised, and he acted only within the broad context of ABF's goals to be as profitable as possible. Additionally, driver seniority was not an issue once drivers were on the road. His decisions, therefore, were "done rather by instinct and from experience than according to any laid out rules." *McComb*, 95 F.Supp. at 640.

Second, there is no doubt that Plaintiff's actions affected matters of great importance to the company. As stated in *Nordquist*,

> Matters of consequence are those of real and substantial significance to the policies or general operations of the business of the employer or the employer's customers. This does not mean that exemptions are limited to persons who participate in the formulation of overall policies regarding the operation of the

business as a whole—the tasks may be directly related to merely a particular segment of the business, but still must have a substantial effect on the whole business.

32 Cal.App.4th at 563, 38 Cal.Rptr.2d 221 (internal quotation marks and citation omitted). The Long Beach facility shipped hundreds of thousands of dollars of freight each day while Plaintiff was on his shift. If Plaintiff failed to make informed decisions in his assignments, ABF would have directly and significantly suffered (e.g., loss of goodwill for not effectively meeting its clients' needs). Plaintiff's decisions were of vital importance to ABF on a daily basis.

## IV. CONCLUSION

For the foregoing reasons, this Court GRANTS Defendant's motion for summary judgment. This Court therefore DENIES Plaintiff's motion for partial summary judgment.

IT IS SO ORDERED.